UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| DATACELL EHF., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil No. 1:14-cv-1658-GBL-TCB** |
| | ) | |
| VISA INC., VISA EUROPE LTD., and | ) | |
| MASTERCARD INCORPORATED, | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANT VISA INC.'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO DISMISS**

**INTRODUCTION**

Plaintiff DataCell is an entity that provides services to Sunshine Press, the operator of the website WikiLeaks. DataCell alleges that Visa Inc.,[1] Visa Europe Ltd. ("Visa Europe"), and MasterCard Incorporated ("MasterCard") instructed certain third parties to stop processing payments to WikiLeaks in December 2010 when WikiLeaks began publishing classified and highly sensitive national security information on its website—a national security breach that brought condemnation from the President of the United States, the American national security agencies, foreign governments and many others, and that ultimately led to criminal espionage indictments in this District and elsewhere. DataCell has dressed up these grievances as a violation of federal antitrust law and Virginia law, alleging that Visa Inc. violated the Sherman Act, Virginia antitrust law, and committed Virginia law torts by "conspiring" (back in 2010) to suspend the processing of credit card donations to WikiLeaks—donations that would support

---

[1] Visa Inc. is a wholly distinct entity from Visa Europe Ltd., which is separately owned and managed. Any reference to "Visa Inc." in the below refers only to Visa Inc. and not Visa Europe Ltd. According to the docket, Visa Europe Ltd. has not been served.

potentially illegal activity and damage Visa Inc.'s brand.  DataCell's threadbare 7-page complaint must be dismissed for several independent reasons.

*First*, this Court lacks personal jurisdiction over Visa Inc.  Requiring Visa Inc. to answer for purported conduct and alleged injuries that did not occur in this jurisdiction—indeed, that have no connection whatever to this jurisdiction—would violate due process principles, as most recently underscored by the Supreme Court in *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014), and *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853-54 (2011).

*Second*, DataCell lacks standing to bring these claims, as it has suffered no Article III injury or "antitrust injury" within the meaning of the Sherman Act.  DataCell's Sherman Act claims allege a vague and inscrutable injury to the "media market."  Compl. ¶ 29.  But any injury to the media market (whatever that may be) is not a concrete, palpable injury—of any sort—to DataCell, which is not a participant in the media market.  Moreover, DataCell does not allege that any injury to it or to the "media market" could be fairly traceable to Visa Inc.'s conduct. DataCell therefore lacks Article III standing to bring these claims.  Moreover, under the doctrine of antitrust standing, whatever injury DataCell purports to assert is *not* the type of injury that the *antitrust* laws were designed to protect against, as DataCell's alleged injuries simply have nothing to do with harm to competition or harm to markets.

*Third*, assuming that DataCell can clear the significant hurdle of Article III and antitrust standing, DataCell's barebones complaint fails to state a plausible substantive antitrust claim. Under the governing standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), DataCell must show that its claims are "plausible" to survive a motion to dismiss.  That means DataCell must plausibly allege a conspiracy among Visa Inc., Visa Europe, and MasterCard to impose an unreasonable restraint

of trade in a specified market.  DataCell's conclusory allegation that Visa Inc., Visa Europe, and MasterCard "conspired"—with no factual allegations regarding the scope, timing, or nature of any alleged agreement—is not sufficient to permit a conspiracy case to go forward under *Twombly*.  Moreover, DataCell must allege—but does not—facts that are more suggestive of *illegal* and *joint* conduct rather than facts tending to show that Visa Inc. and the other defendants (and many other entities generally) engaged in unilateral conduct and stopped doing business with WikiLeaks to safeguard their own respective businesses and goodwill.  Beyond that, DataCell has not alleged any relevant economic market, or claimed that anticompetitive effects occurred within a relevant economic market, due to Visa Inc.'s alleged actions.

Finally, DataCell's claims under Virginia law also fail.  Even if this Court has *personal* jurisdiction over Visa Inc., the Virginia claims fail because none of the relevant conduct or injuries occurred in Virginia, and Virginia substantive law cannot apply extraterritorially as a matter of due process.  But even assuming that the Court could constitutionally apply Virginia law to the conduct alleged in this case, DataCell's piggy-back Virginia-law claims fail for the same reasons that DataCell fails to state a claim under the Sherman Act.  Accordingly, all of DataCell's claims should be dismissed.

## FACTUAL BACKGROUND

In November 2010, WikiLeaks, "an organization devoted to revealing secret documents," published "[a] cache of a quarter-million confidential American diplomatic cables," the release of which sent "shudders through the diplomatic establishment" and had a destabilizing impact on international affairs that was "impossible to predict."  Scott Shane & Andrew W. Lehren, *Leaked Cables Offer Raw Look at U.S. Diplomacy*, N.Y. Times, Nov. 28, 2010 ("Leaked Cables Article"); *see also* Compl. ¶ 11.  The publication of these classified government documents was uniformly condemned by United States officials, including the President of the United States and

3

the most senior officials in the intelligence community.  National Security Advisor General

James Jones "strongly condemn[ed]" the disclosure which "could put the lives of Americans and

our partners at risk, and threaten our national security."  Press Release, The White House,

Statement of National Security Advisor General James Jones on WikiLeaks (July 25, 2010),

*available at* https://www.whitehouse.gov/the-press-office/statement-national-security-advisor-

general-james-jones-wikileaks; *see also* Press Release, The White House, Statement by the Press

Secretary (Nov. 28, 2010), *available at* https://www.whitehouse.gov/the-press-

office/2010/11/28/statement-press-secretary (noting that disclosures "put at risk our diplomats,

intelligence professionals, and people around the world").[2]

WikiLeaks obtained over 250,000 documents from an Army intelligence official, Bradley

Manning, who illegally downloaded the documents from a military computer system.  *See*

Leaked Cables Article at 5.  Bradley Manning was prosecuted under the Espionage Act and is

currently serving a 35-year sentence in military prison.  *See* Julie Tate, *Bradley Manning*

*Sentenced to 35 Years in WikiLeaks Case*, Wash. Post, Aug. 21, 2013.

### The Allegations in the Complaint

DataCell is a "technical service provider" for WikiLeaks, which is legally organized as

Sunshine Press.  *See* Compl. ¶¶ 7-8.  Sunshine Press's funding comes from donations, many of

which are alleged to have been made using credit cards, including Visa Inc. and MasterCard

cards.  *Id.* ¶ 9.  According to the Complaint, the November 2010 leak of hundreds of thousands

---

[2]  Visa Inc. respectfully requests that the Court take judicial notice of certain matters of public record and otherwise judicially noticeable documents.  Concurrently with this motion, Visa Inc. has filed a Request for Judicial Notice, listing those judicially noticeable materials and requesting that the Court consider them pursuant to Federal Rule of Evidence 201 and governing precedent in this circuit.  *See, e.g.*, *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  While judicial notice of these materials is not necessary to resolve this motion, the noticed materials provide useful background to the case.

of pages of diplomatic secrets raised concerns in the United States.  *Id.* ¶ 12.  Senator Lieberman "called for any company or organization providing services to Sunshine Press immediately to cease any business relationship with it," and Congressman King "requested that Sunshine Press be placed on the terrorist organization list and that it be blacklisted from doing any business with American companies."  *Id.* ¶¶ 13-14.

Visa Inc. is an American company, incorporated in the State of Delaware and headquartered in Foster City, California, in Silicon Valley.  *See* Compl. ¶ 2.  Founded in 1958, Visa Inc. is a leading company in payment technologies, and it has revolutionized commercial activity across the globe, empowering consumers to use their money in efficient, low-cost ways. *See* History of Visa Inc., www.visa.com/about-visa/our-business/history-of-visa.jsp.

Critical to Visa Inc.'s operations is its corporate policy to ensure that Visa Inc.'s brand is not associated with illegal activity, including specific corporate rules and programs to make sure that Visa-sponsored transactions do not facilitate illegal activity.  *See* Visa Inc. Core Rules and Visa Product and Service Rules, *available at* http://usa.visa.com/download/about_visa/15-April-2015-Visa-Rules-Public.pdf.  Specifically, Visa Inc. forbids submission of any illegal transactions (*see id.* at Section 1.5.1.3).  Visa Inc. has a Global Brand Protection Program that "monitors Acquirers, Merchants, Payment Facilitators, and Sponsored Merchants to ensure" that these entities do not "[p]rocess illegal Transactions or are not associated with illegal activity." *Id.* at Glossary-763.  Visa Inc. also reserves the right to terminate any of its agreements where the party repeatedly violates Visa Inc.'s own rules or otherwise is engaged in fraud or "[a]ny other activity that may result in undue economic hardship or damage to the goodwill of the Visa system."  *Id.* at Core Rules-73.

Visa Europe is a British corporation headquartered in the United Kingdom.  Compl. ¶ 3. Visa Inc. does not own or control Visa Europe.  *See* Visa Inc. Annual Report 4 (Form 10-K) (Nov. 20, 2014) ("2013 10-K") ("Visa Europe Limited remains owned and governed by its European member financial institutions and is not a subsidiary of Visa.").  Visa Inc. reported in its latest 10-K that "Visa Europe's exclusive license of our trademarks and technologies under the Framework Agreement gives [Visa] little ability to control and oversee Visa Europe's operations in its region."  *Id.* at 24.

MasterCard is a Delaware corporation headquartered in New York.  Compl. ¶ 4. Together, Visa Inc., Visa Europe, and MasterCard, are the defendants in this case.

As alleged in the Complaint, DataCell and Sunshine Press jointly entered into a contract with PBS International A/S of Denmark ("PBS/Teller") in October 2010 through which "PBS/Teller agreed to provide acquiring services for credit card transactions to DataCell and Sunshine Press through its licensee, Korta," which is an Icelandic company that facilitates credit card payment via websites in Iceland.  Compl. ¶ 10.  Exhibit A of the Complaint is a copy of the executed contract, and it makes clear that PBS/Teller is "fully responsible for and controls the relationship/communications with [DataCell and Sunshine Press], including the services to be provided by [Korta] to" DataCell and Sunshine Press.  *Id.* at Ex. A.

The Complaint does not explain the relationship between PBS/Teller and Visa Inc. or any of the other defendants.  DataCell claims that in wake of the November 2010 leak, Senator Lieberman and Congressman King instructed their respective staffs "to contact [Visa Inc.] and [MasterCard] and demand that they block individuals from donating money to Sunshine Press" and that these efforts were "coordinated and . . . successful."  Compl. ¶ 15.  Further, DataCell asserts that on December 7, 2010, Visa Europe, "at the direction of defendant VISA, instructed

PBS/Teller immediately to suspend the processing of any VISA payments for DataCell, because of its association with Sunshine Press." *Id.* ¶ 17.  MasterCard allegedly instructed PBS/Teller the same on December 7, 2010, and the suspensions began on the next day, December 8, 2010. *Id.* ¶ 18.  DataCell subsequently opened another account with Valitor, another Icelandic company that is purportedly a Visa and MasterCard licensee in Iceland, on June 15, 2011; however, on July 8, 2011, Valitor also suspended payments to DataCell, allegedly "after being contacted by VISA and MasterCard."  *Id.* ¶¶ 19-21.

DataCell claims that the payment suspensions by Visa Inc., Visa Europe, and MasterCard violate the Sherman Act because they "successfully conspired with each other, at the insistence of Senator Lieberman and Congressman King, to prevent DataCell from receiving any payments using their credit cards by instructing PBS/Teller and Valitor to cease providing services to Sunshine Press, which they did."  Compl. ¶ 23.  DataCell points to no communications, meetings, or other evidence of any conspiracy between the Defendants other than the independent statement of MasterCard that it communicated with Senator Lieberman's and Congressman King's staff regarding Sunshine Press.  *Id.* ¶ 16.  Moreover, WikiLeaks' own website details a series of similar, independent actions taken by prominent American companies to prevent facilitating WikiLeaks' controversial practices:  Amazon removed WikiLeaks materials from its cloud-storage service; EveryDNS stopped hosting the wikileaks.org domain name; PayPal discontinued service to WikiLeaks; Bank of America and Western Union discontinued service to WikiLeaks; and Apple removed the WikiLeaks application for iPhones— all directly after the November 2010 publication of classified material.  *See* WikiLeaks: Banking Blockade and Donations Campaign 14-18, *available at* https://www.wikileaks.org/IMG/pdf/WikiLeaks-Banking-Blockade-Information-Pack.pdf

("Banking Blockade"); *see also, e.g.*, Miguel Helft, *Why Apple Removed A Wikileaks App From Its Store*, N.Y. Times (Dec. 21, 2010).

DataCell asserts that the Defendants had no "legitimate economic reason to prevent credit card payments to DataCell," and that DataCell was "damaged" as a result of these purported Sherman Act violations.  Compl. ¶ 28-30.

### The Instant Action

On December 8, 2014, on the very last day of the four-year Sherman Act statute of limitations, DataCell filed this suit in the Eastern District of Virginia, but it did not serve its Complaint on Visa Inc. until March 31, 2015.  It appears that this litigation is part of an ongoing campaign by WikiLeaks to harass financial institutions that have refused to facilitate payments to WikiLeaks.  Describing the decision made by these financial institutions as a "blockade," WikiLeaks has sought to "aggressively fundraise in order to fight back against this blockade and its proponents," citing examples of litigation "against the blockade in Iceland, Denmark, the UK, Brussels, the United States, and Australia."  Banking Blockade at 5.

As part of these efforts, on July 14, 2011, WikiLeaks "lodged an anti-trust complaint at the European Commission," asking it to open a full investigation into the alleged wrongdoing by Visa Europe, MasterCard, and American Express—but, notably, *not* Visa Inc.. *Id.* at 5, 8.  Just as in this case, that antitrust complaint was actually filed by DataCell, on behalf of WikiLeaks (a/k/a Sunshine Press).  The European Commission reviewed the antitrust claims asserted by DataCell, which were largely the same as those asserted here, and concluded that a full investigation was not warranted, and that DataCell's "allegation that these payment card schemes infringe EU competition law" was without merit.  *See* Letter from European Commission to

DataCell regarding Case COMP/39921 – Datacell/Visa & MasterCard (Oct. 25, 2012), *available at* https://wikileaks.org/IMG/pdf/EUPreliminaryDecision1.pdf.

DataCell's complaint fails to state any plausible claim—to the contrary, it is meritless if not harassing—and therefore Visa Inc. respectfully moves for dismissal of the complaint.

## LEGAL STANDARD

In evaluating a Rule 12(b)(6) motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true" to determine whether the plaintiff has stated a claim for relief. *Skillstorm, Inc. v. Elec. Data Sys., LLC*, 666 F. Supp. 2d 610, 615 (E.D. Va. 2009) (Lee, J.) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).  In addition to the complaint, the Court may consider "documents incorporated into the complaint by reference" and other matters "of which [the] court may take judicial notice." *Id.* (internal quotation marks omitted).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not" survive a Rule 12(b)(6) motion, and a complaint is "insufficient if it relies upon 'naked assertions devoid of further factual enhancement.'" *Id.* (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)).

The touchstone for surviving a Rule 12(b)(6) motion is whether the factual allegations, taken as true, set forth "'a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The requirement for specific factual allegations is *heightened* in the context of antitrust litigation, which can be *extremely* costly for defendants, so "'a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'" *Twombly*, 550 U.S. at 558 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983)).  Thus, to proceed to discovery, plaintiffs must have

alleged sufficient facts to "nudge[] their claims across the line from conceivable to plausible." *Id.* at 570; *see also Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 279 (4th Cir. 2012) (where conspiracy allegations did not show conspiracy rather than independent action, dismissal was required); *SD3, LLC v. Black & Decker (U.S.), Inc.*, 1:14-cv-191, 2014 WL 3500674, at *3 (E.D. Va. July 15, 2014) (same).

**ARGUMENT**

## I.     This Court Lacks Personal Jurisdiction Over Visa Inc.

This Court lacks personal jurisdiction over Visa Inc., as it would violate principles of due process to hold Visa Inc. to answer claims in a jurisdiction that is wholly disconnected from any of the alleged conduct or injuries in DataCell's complaint.[3]  In particular, although DataCell brings its purported federal antitrust claim in this district pursuant to Section 12 of the Clayton Act, holding Visa Inc. to answer for this claim in this district violates the principles of due process recently reaffirmed by the Supreme Court in *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014), and *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853-54 (2011).

DataCell bears the burden of proving, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction.  *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).  To establish personal jurisdiction, DataCell must demonstrate that the Court has *general* or *specific* jurisdiction over Visa Inc.  DataCell can show neither.  As an initial matter, the Supreme Court has made clear that for corporations, the "'paradigm forum for the exercise of general jurisdiction'" is the "place of incorporation and principal place of business."  *Daimler*, 134 S. Ct. at 760 (quoting *Goodyear*, 131 S. Ct. at 2853-54).  Visa Inc. is not incorporated in Virginia, nor is its principal place of business in Virginia (*see* Compl. ¶ 2),

---

[3]   Visa Inc. hereby joins in the personal jurisdiction arguments made by MasterCard.

and the Complaint makes no attempt to plead facts that would subject Visa Inc. to general jurisdiction in Virginia.

As to specific jurisdiction, this Court may assert jurisdiction over Visa Inc. if DataCell's claims "aris[e] out of or relat[e] to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). The Complaint is devoid of any statements that would allege a nexus between Virginia and either Visa Inc.'s conduct or DataCell's injuries.

Section 12 of the Clayton Act authorizes venue and service of process in specified circumstances, but Congress through Section 12 cannot override the due process limitations on personal jurisdiction set forth in *Daimler* and *Goodyear*. Pursuant to Section 12, some courts before *Goodyear* and *Daimler* concluded that a corporation's "national contacts" with the United States were sufficient to establish personal jurisdiction over the corporation in any State, instead of applying the conventional minimum contacts tied to *state* jurisdictional lines. The Fourth Circuit, however, has not expressly adopted this interpretation with regard to Section 12. Nor has the Supreme Court.[4]

The "national contacts" test for personal jurisdiction cannot be reconciled with the Supreme Court's most recent jurisdictional decisions. The liberty interest secured by the Due

---

[4] The Supreme Court has twice declined to rule on the constitutionality of a "national contacts" test. *See Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 102 n.5 (1987); *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113 n.* (1987). Before both *Daimler* and *Goodyear,* the Fourth Circuit applied a "national contacts" test under RICO, and some district courts within the Fourth Circuit (also before *Daimler* and *Goodyear*) have taken this approach with regard to Section 12. *See ESAB Grp., Inc. v. Centricut, Inc.*,126 F.3d 617, 626-27 (4th Cir. 1997) (RICO); *see also Dee-K Enters., Inc. v. Heveafil SDN, BHD*, 982 F. Supp. 1138 (E.D.Va. 1997) (Clayton Act); *Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, 775 F. Supp. 2d 790, 800 (D. Md. 2011) (Clayton Act) ; *In re Polyester Staple Antitrust Litig.*, MDL Docket No. 3:03CV1516, 2008 WL 906331, at *12 (W.D.N.C. Apr. 1, 2008) (Clayton Act). A "national contacts" test cannot be reconciled with *Daimler* or *Goodyear*.

Process Clause of the Fourteenth Amendment and by the Due Process Clause of the Fifth Amendment both protect non-resident defendants from being haled into Court unreasonably and unfairly.  *See Daimler*, 134 S. Ct. at 751; *Goodyear*, 131 S. Ct. at 2853-54; *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  In *Goodyear*, which involved a federal statutory claim, and *Daimler*, which involved a state-law claim, the Court made clear that, absent "extraordinary circumstances," a non-resident defendant could not be subject to general jurisdiction outside its principal place of business or place of incorporation.  There is no principled distinction to be drawn between the liberty interests protected by the Fifth and Fourteenth Amendments, and thus no reason why Visa Inc. should be subject to personal jurisdiction in Virginia under the Sherman Act when it would plainly not be subject to personal jurisdiction for a different federal statutory claim (as in *Daimler*).  Congress cannot through Section 12 override constitutional limitations on the exercise of personal jurisdiction, in the same way that Congress could not—by statute— eliminate the *constitutional* right to a jury trial in civil cases, U.S. Const. amend. VII, or the right to be free from excessive fines, U.S. Const. amend. VIII.

None of the conduct in this case is alleged to have occurred in Virginia.  None of DataCell's injuries are alleged to have been suffered in Virginia.  Nothing about this case makes it fair or reasonable for Visa Inc. to have to litigate in Virginia, away from all the evidence and witnesses, simply because DataCell has chosen this forum.  Visa Inc. is not constitutionally subject to general or specific jurisdiction in Virginia, and the Complaint should be dismissed on that basis.

## II.     DataCell Lacks Standing To Bring Its Antitrust Claims.

DataCell also lacks standing—under both Article III and the antitrust laws—to bring its antitrust claims because it has not been injured and has not suffered "antitrust injury."

A.     **DataCell Lacks Article III Standing.**

It is axiomatic that federal jurisdiction under Article III extends only to "cases" and "[c]ontroversies," and that the "irreducible constitutional minimum of standing" requires plaintiff to establish:  (1) injury in fact that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) a causal connection between the injury and the conduct complained of; and (3) it must be "likely" that the injury can be redressed by a favorable judicial decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted).  "The plaintiff bears the burden of establishing injury, traceability, and redressability because it is the party seeking to invoke federal jurisdiction."  *Friends of Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) (citing *Lujan*, 504 U.S. at 561).  DataCell has failed to allege facts sufficient to establish that it was injured, that Visa Inc.'s conduct caused that injury, and that its injury could be redressed by this Court.

1.     **DataCell Alleges No Concrete, Palpable Injury.**

DataCell has failed to allege any concrete injury to support Article III standing.  Injury in fact consists of a "concrete and particularized" "invasion of a legally protected interest" that is "actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (internal quotation marks omitted).  The only allegations of injury under the Sherman Act are that "[t]he defendants' blockade of credit card payments to DataCell, because of its association with Sunshine Press, injured the media market by suppressing the market place of ideas."  Compl. ¶ 29.  By its terms, this allegation of injury does not assert that *DataCell* was injured, but that "the media market" in general was injured.  Although the allegation is somewhat inscrutable, even considered in the light most favorable to the plaintiff, it establishes no injury to DataCell.  DataCell does not describe any concrete, particularized injury suffered by the "media market," nor has it alleged that it is even part of that "media market."  *See Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801,

13

808 (E.D. Va. 2007) (holding that "the complaint fails to allege *facts* from which injury in fact may be inferred").  Nor has DataCell even attempted to allege how it was injured by the alleged "suppress[ion] [of] the market place of ideas."

The only other allegation of Sherman Act injury is the general statement that "DataCell was damaged" by the alleged antitrust violation.  Compl. ¶ 30.  That conclusory allegation is insufficient.  A bare bones allegation that plaintiff suffered harm—without "specific assertions of injury"—is not "sufficiently concrete and particularized to confer standing."  *Salt Inst. v. Thompson*, 345 F. Supp. 2d 589, 599 (E.D. Va. 2004) (Lee, J.), *aff'd*, 440 F.3d 156 (4th Cir. 2006).  Accordingly, DataCell has failed to allege injury for purposes of Article III, and those claims should be dismissed.

### 2.     Visa Inc.'s Conduct Did Not Cause Any Injury To DataCell.

In order to establish Article III standing, DataCell also must show that Visa Inc.'s conduct caused DataCell's purported injury; in other words, DataCell must show that its injury is "fairly traceable" to the challenged conduct.  *Lujan*, 504 U.S. at 590.  The "fairly traceable requirement is in large part designed to ensure that the injury complained of is not the result of the independent action of some third party not before the court."  *Friends for Ferrell Parkway*, 282 F.3d at 324 (internal quotation marks omitted); *see also Bishop v. Bartlett*, 575 F.3d 419, 425 (4th Cir. 2009).

Here, DataCell has failed to adequately allege that Visa Inc.'s conduct directly caused its purported injury.  The chain of causation is attenuated and speculative, and any causal connection is broken at various points by the actions of independent third parties.  For example, DataCell alleges a generalized injury to the "media market," but that injury only affects DataCell "because of its association with Sunshine Press."  Compl. ¶ 29.  In addition, the alleged suspension of payment processing was implemented by PBS/Teller and Valitor, independent

14

third parties *in Iceland* that are not before this Court. *Id.* ¶ 23. Moreover, the contract between PBS/Teller and DataCell, incorporated by reference into the Complaint, makes clear that PBS/Teller—and no other entity—was "fully responsible" and "control[led]" the relationship with DataCell. *Id.* at Ex. A.

The causal chain as to Visa Inc. becomes even further attenuated because Visa Europe was the party that allegedly instructed PBS/Teller to stop payment processing, purportedly "at the direction" of Visa Inc. Compl. ¶ 17. Visa Inc. has no control over Visa Europe—the two are separate entities. *See* 2013 10-K, at 4, 24. And PBS/Teller provided services to DataCell through its own licensee, Korta, another independent third party not before the Court. In sum, the causal chain consists of a long speculative string leading to DataCell's purported injury:

> Visa Inc. Purportedly Directs Suspension → Visa Europe Directs Suspension → PBS/Teller Directs Suspension → Korta Suspends Payments → Injury to the Media Market → Sunshine Press's Injury → DataCell's Injury

Courts routinely dismiss claims when the "line of causation between [the challenged] conduct and [the purported injury] is attenuated at best," *Allen v. Wright*, 468 U.S. 737, 757 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), as it is here. Similarly, DataCell's purported injury is several speculative jumps away from any of Visa Inc.'s alleged conduct, and more importantly, it is broken up by the actions of at least three independent third parties (Visa Europe, PBS/Teller, and Korta), two of which are not before this Court.[5]

---

[5]   *See, e.g., Friends of Ferrell Parkway*, 282 F.3d at 324 (affirming dismissal of claim predicated on alleged injuries caused by "the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict"); *Allen*, 468 U.S. at 758-59 (concluding that "[t]he links in the chain of causation between the challenged [conduct] and the asserted injury are far too weak for the chain as a whole to sustain [plaintiff's] standing"); *Frank Krasner Enters., Ltd. v. Montgomery Cnty., Md.*, 401 F.3d 230, 236 (4th Cir. 2005) (holding that

*(Cont'd on next page)*

### 3.    DataCell's Purported Injury Cannot Be Redressed By This Court.

The Article III standing requirement that injury be caused by a defendant's conduct often overlaps with the separate but related requirement that the injury be redressable by the Court. *Massachusetts v. EPA*, 549 U.S. 497, 543 (2007) ("[T]he questions of causation and redressability overlap."); *see also Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005) (noting that redressability and traceability are "two sides of a causation coin") (internal quotation marks omitted).  In order to establish redressability, a plaintiff must show a "substantial likelihood" that the relief requested will redress the alleged injury.  *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 75 n.20 (1978).

Here, DataCell has not shown how an injury to the "media market" will be redressed by this Court.  DataCell seeks $5,000,000 in damages, but it has failed to explain how that monetary reward would redress any alleged damage to the media market caused by the purported "suppress[ion] . . . of ideas."  Compl. ¶ 29.  DataCell does not seek any sort of injunctive relief, nor could it, as such relief would require an order from this Court to PBS/Teller and Valitor, when those parties are not before this Court.  The lack of redressability also demonstrates DataCell's lack of standing.

### B.    DataCell Also Lacks Antitrust Standing.

To establish antitrust standing under federal law, a plaintiff must "go beyond a showing that it meets the Article III standing requirements" and show that the injury was caused by a

---

*(Cont'd from previous page)*

plaintiff lacked standing because "an intermediary . . . stands directly between the plaintiffs and the challenged conduct in a way that breaks the causal chain"); *Sierra Club v. U.S. Def. Energy Support Ctr.*, No. 01-11-cv-41, 2011 WL 3321296, at *5 (E.D. Va. July 29, 2011) (holding that plaintiffs failed the causation requirement of standing because the purported causal connection require "logical leaps and attenuated assumptions").

violation of the antitrust laws. *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 310 (4th Cir.

2007). This Court examines five factors to determine whether a plaintiff has antitrust standing:

> (1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended; (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws; (3) the directness of the alleged injury; (4) the existence of more direct victims of the alleged antitrust injury; and (5) problems of identifying damages and apportioning them among those directly and indirectly harmed.

*Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006) (citations and internal quotation

marks omitted). The first two factors of this analysis are known as "antitrust injury," *Novell*, 505

F.3d at 311, in other words, "injury of the type the antitrust laws were intended to prevent and

that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA*

*Petroleum Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,

429 U.S. 477, 489 (1977)). Here, DataCell has failed to establish any "antitrust injury." Nor can

it make a showing of antitrust standing under any of the remaining factors.

### 1.   DataCell Has Not Suffered Antitrust Injury.

The antitrust laws were designed to "foster competition," and thus an antitrust injury is

one that *reduces competition in a relevant market*. *E. Auto Distribs., Inc. v. Peugeot Motors of*

*Am., Inc.*, 573 F. Supp. 943, 948 (E.D. Va. 1983); *see also Brunswick*, 429 U.S. at 488 ("The

antitrust laws . . . were enacted for 'the protection of *competition* not competitors.'") (quoting

*Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)) (emphasis added). Antitrust injury

"should reflect the anticompetitive *effect* either of the violation or of anticompetitive acts made

possible by the violation." *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 850 F. Supp. 470,

476 (E.D. Va. 1994), *aff'd*, 57 F.3d 1317 (4th Cir. 1995) (emphasis added). The "absence of

antitrust injury is alone fatal." *Id.* (internal quotation marks omitted). Here, even if DataCell can

allege some injury to the "media market" or some other damage resulting to it from the

suspension of payments, that injury is *not* the type of injury that the antitrust laws were designed to prevent.

DataCell claims a violation of Section 1 of the Sherman Act, which prohibits agreements in restraint of trade, i.e., anticompetitive conspiracies.  Even if that claim were plausible (which it is not), the injury resulting from any purported agreement among Visa Inc., Visa Europe, and MasterCard is not an anticompetitive injury inflicted on competitors or consumers within a relevant economic market.  DataCell does not allege that it is a competitor to Visa Inc., Visa Europe, and MasterCard or that it has been unable to compete in a relevant market.  Nor does DataCell allege that there has been any harm to any competition in any relevant market.

In *Kloth*, the Fourth Circuit rejected an argument by computer purchasers that Microsoft violated the antitrust laws by abusing its dominant market position and requiring Internet Explorer to be installed on plaintiffs' computers, which in turn allegedly degraded computer performance.  444 F.3d at 323.  "This type of injury is simply not a type for which plaintiffs can recover under the antitrust law," the court concluded, because plaintiffs failed to allege that the "purpose for inflicting this injury was aimed at *lessening competition*."  *Id.* at 325 (emphasis added).  Also important to the court's analysis was that plaintiffs' claims in substance sounded in "breach of warranty or other product liability."  *Id.*  Similarly, here, DataCell has made no allegation that Defendants conspired against DataCell *with the aim of lessening competition* in any relevant market.  Whatever injury DataCell can make out consists of a complaint that its contract with Korta and Valitor was allegedly terminated, which is not "th[e] type of injury . . . for which plaintiffs can recover under antitrust law," because it has nothing to do with harm to competition.  *Id.* at 323-24.  Those injuries are plainly not the sort of harms that the antitrust laws were designed to prevent.

### 2. DataCell Has No Antitrust Standing Under the Remaining Factors.

Additionally, none of the remaining factors for antitrust standing supports DataCell's standing here. *See Kloth*, 444 F.3d at 324. Specifically, courts look to the directness of the alleged injury, the existence of more direct victims, and problems identifying damages and apportioning them among those harmed. *Id.* These factors support a conclusion that DataCell lacks antitrust standing.

*First*, any injury to DataCell is indirect, attenuated, and speculative. *Second*, even if the injury to the media market is cognizable, there are many more direct victims of that injury. For example, actual participants in the market place of ideas and consumers of media would theoretically be direct victims, but DataCell is neither. *Third*, due to the vague and boundless scope of the alleged injury to the media market, it would be nearly impossible to identify and define that market in any non-speculative, responsible manner. For these reasons, DataCell lacks antitrust standing and its antitrust claims should be dismissed.

### III. DataCell Failed To State A Claim Under The Sherman Act.

Section 1 of the Sherman Act prohibits in relevant part any "contract, combination[,] . . . or conspiracy, in restraint of trade." 15 U.S.C. § 1. To establish a violation of Section 1 of the Sherman Act, a plaintiff must show: "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002). "[B]ecause 'the antitrust laws were enacted for the protection of competition, not competitors, a plaintiff must show that the net effect of a challenged restraint is harmful to competition." *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002) (quoting *Atl. Richfield Co.*, 495 U.S. at 338) (alteration omitted). DataCell has failed to plausibly allege that either element is satisfied, thus its Sherman Act claim should be dismissed.

19

### A.    DataCell Has Failed To Plausibly Alleged A Conspiracy.

It is black-letter law that "[i]ndependent action is not proscribed" by the Sherman Act. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984).  "A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."  *Id.*; *see also Loren Data Corp. v. GSX, Inc.*, 501 F. App'x 275, 280 (4th Cir. 2012).  The "distinction between unilateral and concerted action is critical."  *Fisher v. Berkeley*, 475 U.S. 260, 266 (1986).  DataCell has no legal right requiring Visa Inc. to do business with it. To establish *concerted* action, a plaintiff must show that the defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto*, 465 U.S. at 764 (internal quotation marks omitted).

*Twombly* is the touchstone case governing the required showing for a conspiracy under Section 1 of the Sherman Act.  For a claim under Section 1 to survive a motion to dismiss, the complaint must have "enough factual matter (taken as true) to suggest that an agreement was made."  *Twombly*, 550 U.S. at 556.  "It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice."  *Id.*  "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality," even at the motion to dismiss stage.  *Id.* at 556-57; *see also Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 221 (4th Cir. 1994) (affirming dismissal of complaint lacking any allegations regarding details of conspiracy).  Those principles control this case and compel dismissal of DataCell's formulaic and barebones complaint.

DataCell's complaint is clearly insufficient under *Twombly*.  DataCell alleges that Visa Europe, at the direction of Visa Inc., instructed PBS/Teller to suspend processing of payments. Compl. ¶ 17.  The complaint alleges that MasterCard *separately* instructed PBS/Teller to do the

20

same thing.  *Id.*  This is parallel conduct at its most basic.  *See, e.g.*, *SD3, LLC v. Black & Decker (U.S.), Inc.*, No. 1:14-cv-191, 2014 WL 3500674, at *2 (E.D. Va. July 15, 2014).  There is no allegation of any specific agreement to conspire, besides the formulaic and conclusory claim that "[t]he defendants successfully conspired with each other" to prevent DataCell from receiving payments.  Compl. ¶ 23.  But under *Twombly*, DataCell cannot rely on the formulaic and conclusory allegation of a conspiracy to survive a motion to dismiss.  It must allege sufficient *facts* to make a conspiracy plausible.  Nowhere does DataCell allege any specific meetings or communications between Visa Inc. and MasterCard in which they would have agreed to suspend payment processing for DataCell.

Moreover, the Fourth Circuit has made clear that "concerted activity susceptible to sanction by section 1 is activity in which multiple parties join their resources, rights, or economic power together in order to achieve an outcome that, *but for the concert,* would naturally be frustrated by their competing interests (by way of profit-maximizing choices)."  *Va. Vermiculite, Ltd. v. HGSI,* 307 F.3d 277, 282 (4th Cir. 2002) (emphasis added).  In other words, there must be an economic incentive or benefit for the defendants to come together in *joint* and *illegal* conduct that could not be achieved through unilateral conduct.  If the purported co-conspirators "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986).  Not only must the allegations tend to *exclude* the possibility of independent conduct, "the alleged conspiracy must make practical, economic sense."  *Loren Data Corp.*, 501 F. App'x at 281.

Here, DataCell has offered no plausible economic motive for Visa Inc. and MasterCard to "conspire" to suspend payments to DataCell.  To the contrary, Visa Inc. had an independent

economic motive to *terminate* any of its agreements where a party is engaged in fraud, potentially illegal activity, or "[a]ny other activity that may result in undue economic hardship or damage to the goodwill of the Visa system."  Visa Inc. Core Rules and Visa Product and Service Rules, at Core Rules-73.  Visa Inc. independently had the right and ability—in its business judgment and to protect the goodwill of its businesses—to direct suspension of payments to Sunshine Press, and the allegation that MasterCard made similar decisions (along with Apple, PayPal, Western Union, and so forth) does not make out a Section 1 claim.  *See Loren Data Corp.*, 501 F. App'x at 281 (finding no conspiracy because conduct reflected defendant's "unilateral business judgment as to the parameters under which it was willing to deal with" plaintiff); *Va. Vermiculite*, 307 F.3d at 282 (finding no Section 1 violation in part because defendants "had the right and power" to engage in the challenged conduct).

### B.       DataCell Has Failed To Allege An Unreasonable Restraint Of Trade.

To state a claim under Section 1, DataCell must also show that the alleged agreement was an "unreasonable restraint of trade."  *Dickson*, 309 F.3d at 205.  The Supreme Court recognizes three methods of analysis for evaluating whether an agreement was unreasonable:  "(1) *per se* analysis, for obviously anticompetitive restraints, (2) quick-look analysis, for those with some procompetitive justifications, and (3) the full 'rule of reason,' for restraints whose net impact on competition is particularly difficult to determine."  *Cont'l Airlines*, 277 F.3d at 508-09.

The *per se* mode of analysis applies on a categorical basis to "certain practices, including price fixing, horizontal output restraints, and market-allocation agreements."  *Id.* at 509.  *Per se* violations are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality."  *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978).  The category of *per se* restraints is limited, and "should not be expanded indiscriminately," particularly where "the economic effects of the restraint are far from clear."

22

*Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 708 (4th Cir. 1991).  DataCell has not alleged that the purported agreement between the defendants was *per se* illegal.  DataCell has also not alleged what specific anticompetitive effects flowed from the purported agreement.  Not only are the economic effects of the purported restraint "far from clear," they are nonexistent.  Nor has DataCell alleged that on a "quick look" analysis, the agreement appears to be unreasonably anticompetitive.  In fact, the Complaint is so devoid of detail that it is impossible to tell under which theory DataCell intends to advance its Section 1 claims.

Even applying the rule of reason analysis, it is clear that DataCell has failed to state a plausible claim.  Under the rule of reason, "the reasonableness of a restraint is evaluated based on its impact *on competition as a whole within the relevant market*."  *Oksanen*, 945 F.2d at 708 (emphasis added).  A plaintiff seeking to make out a rule of reason case must establish an "anticompetitive effect," which includes a showing of "what market he contends was restrained and that the defendants played a significant role in the relevant market."  *Id.* at 709.  Accordingly, "an inquiry into the lawfulness of the restraint begins by identifying the ways in which a challenged restraint might possibly impair competition."  *Dickson*, 309 F.3d at 206 (internal quotation marks omitted).  After identifying those possible harms, courts must determine whether that anticompetitive harm "is not only possible but likely and significant, which requires examination of market circumstances, including market power and share."  *Id.* (internal quotation marks omitted).

Here, DataCell has failed to allege any relevant economic market that was damaged by the alleged agreement (except perhaps the "media market").  Nor does DataCell allege any possible anticompetitive effects in any market.  It fails to allege whether any defendants had market power in the media market, whether they had a significant market share, and whether any

23

other competitors or consumers were harmed by the alleged agreement.  Attempting to apply the rule of reason analysis to DataCell's barebones complaint makes evident that there is no factual basis for any antitrust allegation here.  *Dickson*, 309 F.3d at 205-06.

Like the plaintiffs in *Dickson*, DataCell here simply asks the court to "accept its conclusory assertion" that an agreement creates a likelihood of anticompetitive effects in some ambiguous market, without regard to market power or market share.  *Id.* at 212-13.  As in *Dickson*, this Court should refuse to do so.  "The pleader may not evade Rule 12(b)(6) requirements by merely alleging a bare legal conclusion; if the facts do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs will get nowhere merely by dressing them up in the language of antitrust."  *Id.* at 213 (internal quotation marks and alterations omitted).

## IV. DataCell's Virginia-Law Counts Fail to State Claims.

### A. DataCell's Virginia-Law Counts Must Be Dismissed Because Virginia Law Cannot Constitutionally Apply In This Case.

This suit is brought in the Eastern District of Virginia for reasons unrelated to any of the underlying allegations of the Complaint:  Not one of the parties is a resident of Virginia; none of the conduct is alleged to have occurred in Virginia; and none of DataCell's injuries is alleged to have occurred in Virginia.  Under Supreme Court precedent, it is well established that "'for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.'"  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985) (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)).  This limitation on the *extraterritorial* reach of state substantive law applies *even where* a court has personal jurisdiction over a defendant, as *Shutts* demonstrates.  *Id.* at 821; *see also*

24

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421-22 (2003); *United States v. Shahani-Jahromi*, 286 F. Supp. 2d 723, 729-30 n.13 (E.D. Va. 2003).  Because there is absolutely no nexus to Virginia, either by in-state conduct or in-state harm, Visa Inc. cannot be subjected to Virginia-law claims for the alleged transactions and occurrences detailed in the Complaint.  *See Franchise Tax Bd. of Cal. v. Hyatt*, 538 U.S. 488, 494-95 (2003) (for a state to be "competent to legislate" the law to apply in a certain dispute, the state must have some significant claim to the conduct or injuries alleged to have occurred).  Accordingly, the Virginia law claims should be dismissed on the merits with prejudice.

But even if Virginia law could apply, its Virginia-law claims cannot survive Rule 12(b)(6).

### B.      DataCell Fails To State A Claim Under The Virginia Antitrust Act.

Count III of DataCell's Complaint asserts a claim under the Virginia Antitrust Act, which is largely identical to the Sherman Act.  Indeed, Virginia courts follow the federal body of antitrust law.  *See Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351, 358 n.13 (4th Cir. 1983); *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 570 n.27 (E.D. Va. 2000).

DataCell's Virginia Antitrust Act claim is even further attenuated because of the lack of any nexus to Virginia—the closest thing to an injury or act in Virginia that DataCell can allege is that some vague group of "Virginians" were "unable to use credit cards to pay DataCell and Sunshine Press."  Compl. ¶ 38.  DataCell has no standing to sue on behalf of Virginians who may have wanted to give it money using Visa Inc. cards, thus DataCell has pleaded no standing whatsoever, even further afield than its Sherman Act claim.  For this reason and those outlined in Section II, Count III should be dismissed.

### C.      DataCell Fails to State a Claim for Tortious Interference.

To state a tortious interference claim under Virginia law, DataCell must allege "(i) the existence of a valid contractual relationship or business expectancy; (ii) knowledge of the relationship or expectancy on the part of the interferor; (iii) intentional interference inducing or causing a breach or termination of the relationship; and (iv) resultant damage to the party whose relationship or expectancy has been disrupted." *Dunn, McCormack & MacPherson v. Connolly*, 708 S.E.2d 867, 870 (Va. 2011) (citations omitted).  DataCell alleges that Visa Inc. knew of its contracts or business expectancies through PBS/Teller to receive credit card payments on behalf of Sunshine Press and wrongfully interfered with those contracts, although it does *not* allege that Visa Inc. knew that DataCell would be harmed by the termination of those contracts.  Compl. ¶¶ 32-34.  Moreover, DataCell fails to state a claim for tortious interference because it can point to no improper methods used by Visa Inc. in allegedly directing Visa Europe to in turn direct PBS/Teller to suspend services to DataCell, and the claim should be dismissed.

### 1.      To State A Claim For Tortious Interference, DataCell Must Allege Improper Methods.

Virginia law distinguishes between two types of contracts under tortious interference claims—at-will and for-cause arrangements.  Because a contract terminable at-will "is a mere expectancy" and "the plaintiff is entitled to 'no legal assurance that he will realize the expected gain,'" Virginia law requires that an additional element be pleaded in order to state a claim for tortious interference of an at-will contract (or mere expectancy):  That the defendant used some "improper methods" to achieve the interference.  *Skillstorm, Inc. v. Elec. Data Sys., LLC*, 666 F. Supp. 2d 610, 616 (E.D. Va. 2009) (Lee, J.) (quoting *Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987)).  Virginia law defines "improper methods" as "[m]eans that are illegal or independently tortious 'such as violations of statutes, regulations, or recognized common-law rules.'"  *Id.*

Indeed, it is not enough that interference be motivated "by spite, ill will [or] malice" or, by extension, not motivated by any justification at all—the tort requires that some independently objectionable *act* accompany the alleged interference.  *Connolly*, 708 S.E.2d at 871.

DataCell does not allege specifically whether its contracts or expectancies that it claims Visa Inc. tortiously interfered with were terminable at will or only for cause; however, the contracts themselves show a purely at-will arrangement.  Exhibit A to the Complaint is a portion of the PBS/Teller contract with DataCell, which is incorporated by reference in the Complaint and therefore can be considered at the motion to dismiss stage of the litigation.  *See, e.g.*, *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).  First, it states very plainly that "[t]his contract is accompanied by the following annexes" found at "www.korta.is," referring to a number of "General Rules" and other policies and procedures governing the PBS/Teller arrangement, though none of these annexes are currently available on Korta's website.  *See* Compl., Ex. A at 1.  The last line before the signature block, however, clearly states that "PBS[/Teller] is fully responsible for and controls the relationship/communications with the Merchant, including the services to be provided by Korta[] to the Merchant."  *Id.* at 2.  This language clearly indicates a relationship terminable at the will of PBS/Teller; therefore, to state a claim for tortious interference, DataCell must meet the additional pleading requirement to show improper methods.  *See Frank Brunckhorst Co. v. Coastal Atl., Inc.*, 542 F. Supp. 2d 452, 463-64 (E.D. Va. 2008).

> **2.      Because DataCell Fails To State a Sherman Act Claim, It Fails To Allege Improper Methods.**

The fact that DataCell makes only four independent allegations under its tortious interference claim (which are conclusory statements of the elements of the claim) demonstrates that DataCell is bootstrapping its tortious interference claim to its Sherman Act claim.  There is

no suggestion from the Complaint that any other "illegal or independently tortious" acts were committed by Visa Inc. in allegedly interfering with DataCell's contract with PBS/Teller. *Skillstorm, Inc.*, 666 F. Supp. 2d at 616.  But because of the reasons set out in Section II, DataCell fails to state a claim under the Sherman Act.  Accordingly, it does not allege an improper method and thus fails to state a claim.

The Complaint states that Visa Inc. had no "legitimate reason" to interfere with its credit card contracts; however, that is plainly insufficient under Virginia law.  Compl. ¶ 34.  Just as a person needs no legitimate reason to terminate his at-will employment contract, a third party needs no "legitimate" reason to ask the person to leave his at-will employment contract—only if the means are illegal or otherwise independently tortious can such a claim survive.  *See Lewis-Gale Med. Ctr., LLC v. Alldredge*, 710 S.E.2d 716, 721 (Va. 2011) (overturning jury verdict because hospital's pressure on surgery practice to terminate one of its doctor's contracts was insufficient to show improper methods as a matter of law).  DataCell makes no allegations of such independent, improper methods, and the tortious interference claim should be dismissed.

### D.  DataCell's Civil Conspiracy Claim Similarly Fails Because DataCell Fails To Plead an Unlawful Act.

DataCell also alleges civil conspiracy, though it is unclear whether its claim arises under Virginia's common law conspiracy claim or the statutory conspiracy claim under Virginia Code §§ 18.2-499 *et seq*.  For purposes of this motion, however, it is inconsequential because DataCell's Complaint fails under either cause of action because both require allegations of a conspiracy to engage in some *unlawful* activity or purpose.  *See Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014) (explaining that both common law and statutory conspiracy causes of action require pleading of an underlying unlawful act because "there can be no conspiracy to do an act that the law allows"); *see also Dunlap v. Cottman Transmissions Sys.,*

28

*LLC*, 576 F. App'x 225 (4th Cir. 2014) (per curiam) (conforming holding to Virginia Supreme Court's answers to certified question in 754 S.E.2d 313).

DataCell's failure to allege a cognizable violation of the Sherman Act means that it has similarly failed to allege the requisite unlawful activity for a civil conspiracy claim.  DataCell may answer that *Dunlap* expressly allows a tortious interference claim to serve as the underlying unlawful act for a conspiracy claim; however, DataCell would still need to have alleged a valid tortious interference claim.  For the reasons stated earlier, DataCell cannot state a tortious interference claim because it alleges no improper methods.  It all comes back to the fatal flaw in DataCell's complaint—the failure to plead a Sherman Act violation, or any violation of law with any specificity or even plausibility.  Accordingly, DataCell's civil conspiracy claim should also be dismissed.

## CONCLUSION

For the foregoing reasons, Visa Inc. respectfully requests that this Court dismiss the complaint.

Dated:  May 8, 2015                           Respectfully submitted,

                                               /s/Jacob S. Siler
                                               Jacob Siler (Va. Bar No. 80934)
                                               Andrew S. Tulumello (*pro hac vice* pending)
                                               Robert Gonzalez (*pro hac vice* pending)
                                               GIBSON, DUNN & CRUTCHER LLP
                                               1050 Connecticut Avenue, NW
                                               Washington, DC  20036
                                               tel: 202-955-8500
                                               fax: 202-467-0539
                                               JSiler@gibsondunn.com
                                               ATulumello@gibsondunn.com
                                               RGonzalez2@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that, on this 8th day of May, 2015, I have electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following counsel of record:

Philip J. Harvey (Va. Bar. No. 37941)
Jesse R. Binnall (Va. Bar. No. 79292)
Louise T. Gitcheva (Va. Bar. No. 86200)
HARVEY & BINNALL, PLLC
717 King Street, Suite 300
Alexandria, Virginia 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
pharvey@harveybinnall.com
jbinnall@harveybinnall.com
lgitcheva@harveybinnall.com

*Counsel for DataCell ehf*

Stephen E. Noona (Va. Bar. No. 25367)
Mark E. Warmbier (Va. Bar No. 77993)
Kaufman & Canoles, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile:  (757) 624-3169
senonna@kaufcan.com
mewarmbier@kaufcan.com

*Counsel for Defendant MasterCard Incorporated*

Pursuant to the Division-Specific Electronic Case Filing Policies and Procedures, two courtesy copies of the foregoing pleading will be delivered to Chambers within one business day of the electronic filing.

 /s/ Jacob S. Siler
Jacob S. Siler (Va. Bar No. 80934)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC  20036
tel: 202-955-8500
fax: 202-467-0539
JSiler@gibsondunn.com

*Counsel for Defendant Visa Inc.*