## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| DATACELL EHF., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:14-cv-1658 |
| | ) |
| VISA INC., VISA EUROPE LTD., and | ) |
| MASTERCARD INCORPORATED, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DATACELL EHF'S CONSOLIDATED MEMORANDUM OF LAW
## <u>IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>

DataCell ehf's ("DataCell") complaint describes how Visa, Inc. ("Visa") and MasterCard Incorporated ("MasterCard") (together as the "Credit Card Companies") entered into a conspiracy to shut down a controversial media organization, Wikileaks. When the Credit Card Companies were successful in their coordinated attack on Wikileaks, not only did they stifle DataCell's and Wikileaks' participation in the free marketplace of ideas, they also financially harmed DataCell. This suit followed. The Credit Card Companies want this case dismissed for a variety of reasons, but their motions should be denied for the reasons described below.

## I.

## **BACKGROUND**

DataCell partnered with Sunshine Press Productions ehf ("Sunshine Press") to provide Wikileaks with an Internet presence, a website viewable throughout the world. Sunshine Press provided content and sources. DataCell provided, among other things, server hosting and technical support to the project. Funding for the project was provided by donations from supporters, mostly through credit card transactions.

In November 2010, together with other media organizations, Wikileaks released confidential diplomatic cables from the U.S. State Department. Many of these cables were embarrassing to the U.S. government. Consequently, two well-known members of Congress, Joseph Lieberman and Peter King ("Government Officials"), decided to act

in an attempt to silence an inconvenient media outlet. They contacted
Visa and MasterCard, among others, and asked them to help attack
Wikileaks by shutting down their primary source of funding—credit card
donations.

Not wanting to miss the opportunity to score points with influential
government officials, the Credit Card Companies agreed to participate in
conspiracies to silence a media outlet. On the same day, they each
contacted the credit card processor used by DataCell for Wikileaks, a
Danish company called PBS/Teller ("Teller"). They instructed Teller to
immediately suspend payment processing for DataCell, because of its
association with Wikileaks. Teller complied with the demands of the
Credit Card Companies and permanently suspended DataCell's ability to
process credit card payments for Wikileaks.

When DataCell opened a new merchant processing account with
another payment processor in Iceland, known as Valitor, the Credit Card
Companies again leapt into action. On July 8, 2011, after being
contacted by the Credit Card Companies, Valitor stopped all credit card
processing for DataCell because of its association with Wikileaks.

The Credit Card Companies acted intentionally and in concert to
silence a controversial media organization. Their decision to impose their
will on the news media marketplace was a violation of antitrust laws.
They also tortiously interfered with DataCell's contracts and business
expectancies, and participated in a civil conspiracy. DataCell was

harmed and now comes before this Court in an effort to recoup its damages and hold the Credit Card Companies accountable for their deeds.

## II.

### PERSONAL JURISDICTION AND VENUE

Section 12 of the Clayton Act, 15 U.S.C. § 22 ("Section 12") confers upon this Court personal jurisdiction over the Credit Card Companies because of their national contacts with the United States. Since 1914, Section 12 has provided for nationwide service of process against corporate defendants in antitrust suits. Consequently, it is the defendants' contacts with the United States, not Virginia, that are relevant to determining personal jurisdiction. *Id.*

The debate between the circuits over interpretation of the venue clause in Section 12 is irrelevant to this case. Not only does the jurisdictional clause of Section 12 apply to these defendants, the venue clause does as well. That clause provides that venue lies "in any district wherein [a corporate defendant] may be found or transacts business." 15 U.S.C. § 22. Because both Credit Card Companies transact substantial business in Virginia and because they can be found here, venue is proper under Section 12.

Despite the defendants' aggressive argument to the contrary, Section 12 does not violate the constitution. Notwithstanding the provisions of Section 12, however, the defendants are still subject to this

Court's jurisdiction because they have contacts with Virginia that are so expansive that the Court should find that they are both very much at home in the Commonwealth, even in light of the Supreme Court's decisions in *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846 (2011) and *Daimler AG v. Bauman,* 134 S. Ct. 746 (2014).

## Standard of Review

When a defendant challenges a court's personal jurisdiction under Fed. R. Civ. P. 12(b)(2), the burden is on the plaintiff to show grounds for jurisdiction. *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993). If evidence is taken at such a hearing, the plaintiff must prove such grounds by a preponderance of the evidence. *Id.* at 60. If the Court decides the question without an evidentiary hearing, the plaintiff need only make a *prima facie* showing of personal jurisdiction. *Id.* All reasonable inferences arising from the proof and all factual disputes must be taken in the plaintiff's favor. *Id.*

## Section 12 Of The Clayton Act Authorizes This Court's Exercise Of Jurisdiction Over The Credit Card Companies

Because the Clayton Act applies to this case, to exercise personal jurisdiction over the defendants, this Court needs to find (1) that a statute authorizes service of process over each defendant, *Mylan Labs, Inc.,* 2 F.3d at 60, and (2) that each defendant has sufficient national contacts with the United States such that exercising jurisdiction comports with due process. *Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d

1406, 1414 (9th Cir. 1989); *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005).

Over a century ago, Congress adopted Section 12. *U.S. v. Scophony Corp. of Am.*, 333 U.S. 795, 806 (1948). That legislation enlarged the scope for jurisdiction and venue over corporate defendants in antitrust actions. *See id.* at 806-10 (discussing the adoption of the Clayton Act in regards to venue and service of process in antitrust actions); *Go-Video, Inc.*, 885 F.2d at 1410-11 (explaining the legislative history of the adoption of the Clayton Act).

Section 12 has two clauses: a venue clause and a service-of-process clause. The service-of-process clause provides that "all process in such cases may be served in the district of which [the corporation] is an inhabitant, or wherever it may be found." 15 U.S.C. § 22. This provision allows for worldwide service of process and personal jurisdiction, when this section is applicable. *Daniel,* 428 F.3d at 422. Consequently, the relevant jurisdictional analysis is whether the Credit Card Companies have sufficient contacts with the United States, not whether they have sufficient contacts with Virginia. *Go-Video, Inc.*, 885 F.2d at 1414; *Daniel,* 428 F.3d at 423.

Without question, the Credit Card Companies have sufficient minimum contacts with the United States to allow this Court to exercise jurisdiction over them without offending traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945).

Visa and MasterCard are both Delaware corporations. Compl. ¶1-2.

Visa's principal place of business is in California. Compl. ¶ 1;

MasterCard's is in New York. Compl. ¶ 2.

### Venue In This Court Lies Under Section 12, So The Circuit-Split Discussed By The Credit Card Companies Is Immaterial

The defendants point to a disagreement between various circuits over the construction of Section 12. Specifically, the debate is whether a court's exercise of personal jurisdiction over corporate antitrust defendants under Section 12 is predicated upon satisfaction of that statute's specific venue requirement, or whether venue can be satisfied through another federal statute, such as 28 U.S.C. § 1391(b). *Compare Go-Video,* 885 F.2d at 1412-13 (holding that the venue clause and service-of-process clause are independent and venue can be satisfied under § 1391 when jurisdiction is based upon national contacts under Section 12) with *GTE New Media Servs.,* 199 F.3d 1343,1351 (D.C. Cir. 2000) (holding that a party seeking to take advantage of the liberalized service provisions of Section 12 must follow the dictates of both the venue clause and the service-of-process clause) and *Daniel,* 428 F.3d at 423 (agreeing with the D.C. Cir. that the service-of-process clause is dependent on the venue clause). In this case, however, the debate is a red herring because Visa and MasterCard are both subject to Section 12's specific venue clause. Consequently, the dispute between the circuits is irrelevant.

Section 12's venue clause states that any antitrust suit "against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business." 15 U.S.C. § 22. In *U.S. v. Scophony Corp. of Am.*, 333 U.S. 795, 802 (1948), the Supreme Court determined that that this venue provision is intentionally broad and that it substituted "practical, business conceptions for the previous hair-splitting legal technicalities encrusted upon the 'found'-'present'-'carrying-on-business' sequence" previously used to determine venue in such cases, prior to the Clayton Act's adoption. 333 U.S. at 808. The concept of "transacting business" for venue purposes is more lenient than that of *International Shoe's* jurisdictional analysis of "minimum contacts." *Dunham's, Inc. v. Nat'l Buying Syndicate*, 614 F. Supp. 616, 624 (E.D. Mich. 1985).

The defendant in *Scophony* was a British corporation, with its principal place of business in London. The company manufactured and sold televisions. During the Second World War, it moved portions of its operations to New York, where it also opened an office. The company entered into a series of agreements with American motion picture and television companies. Together they formed a new Delaware corporation. Because of these transactions, the U.S. government brought a Sherman Act complaint and the British corporation was served in New York under the provisions of Section 12. The district court quashed service and dismissed the complaint as to the British corporation, because it held

7

that the corporation was not "found" in New York. According to the
district court, the corporation's activities in New York were confined to
protecting its interest in the Delaware corporation, rather than relating to
its ordinary business of manufacturing, selling, and licensing television
equipment. *Scophony,* 333 U.S. at 802.

The Supreme Court reversed and found that venue was
appropriate because of the New York activities of the British corporation
amounted to the transaction of business under Section 12's venue
clause. 333 U.S. at 818. Moreover, it also held that these activities
resulted in the British corporation being "found" in New York for
purposes of the service-of-process clause of Section 12. *Id.*

The Virginia activities of the U.S.-based Credit Card Companies in
this case surpass the New York activities of the British-based corporation
in *Scophony*. Visa is registered to do business in Virginia. Visa U.S.A.,
Inc., SCC eFile Business Entity Details,
https://sccefile.scc.virginia.gov/Business/F031891. It also transacts
substantial business in the Commonwealth. Visa's own website
advertises numerous jobs offered at its Ashburn, Virginia office. *Visa
Ashburn Va: Jobs at Visa*, http://jobs.visa.com/key/visa-ashburn-va-
jobs.html. This 8-acre facility, a data center, is heavily guarded, and even
has a drainage pond, which serves as a modern moat. Jon Swartz, *Top
Secret Visa Data Center Banks on Security, Even has Moat*, USA Today
(March 25, 2012, 5:27 PM),

8

http://usatoday30.usatoday.com/tech/news/story/2012-03-25/visa-data-center/53774904/1.

With regards to MasterCard's contacts with Virginia, the company has contracted with the Virginia Department of Taxation to allow Virginia taxpayers to receive their tax refund on a prepaid MasterCard debit card. Virginia Tax Refund Debit Card, Va. Dept. of Taxation, http://www.tax.virginia.gov/content/refund-debit-cards. Plainly, both can be found here.

## Section 12 Is Constitutional

The Credit Card Companies both suggest that the national contacts test set forth in Section 12 has been implicitly declared unconstitutional by the *Daimler* and *Goodyear* cases. Visa Inc.'s Memo. at 2, 11-12; MasterCard Inc.'s Memo. at 3-6. This aggressive assertion, at best, overstates the holdings of these cases.

Neither the Supreme Court, nor any of the circuit courts of appeal of which DataCell is aware, have ever held that Section 12's national contacts test is unconstitutional. Indeed, the Supreme Court has specifically held that Section 12's service-of-process clause, the basis of the national contacts test in antitrust cases, presented "no conceivable element of offense to 'traditional notions of fair play and substantial justice.'" *Scophony*, 333 U.S. at 818 (citing *Int'l Shoe*, 326 U.S. at 316).

Since *Scophony*, the Court has twice avoided the issue of whether a federal district court can exercise personal jurisdiction under a national contacts test, pursuant to the Fifth Amendment Due Process Clause, as opposed to contacts with the forum state.  *Omni Capital Int'l v. Rudolph & Co.*, 484 U.S. 97, 102 n. 5 (1987); *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 113 (1987).

Neither *Goodyear* nor *Daimler* involved statutes conferring a national contacts test. Instead, in both cases, the Supreme Court simply recognized the limited circumstances in which a trial court can exercise general jurisdiction over foreign defendants, when minimum contacts with the forum state are required. *Goodyear,* 131 S. Ct. at 2852; *Daimler*, 134 S. Ct. at 754.

Section 12 provides a statutory basis for courts to exercise personal jurisdiction over defendants who have sufficient minimum contacts with the United States. Courts must still decide whether exercising personal jurisdiction over the antitrust defendants would violate the Fifth Amendment's due process.  Go-Video, 885 F.2d at 1416 ("In light of our conclusion that there is no Supreme Court precedent to the contrary, we adhere to our decision in *Vigman* that, when a statute authorizes nationwide service of process, national contacts analysis is appropriate. In such cases, 'due process demands [a showing of minimum contacts with the United States] with respect to foreign defendants' before a court can assert personal jurisdiction.") (internal

10

citations omitted).  Because, however, the Credit Card Companies have sufficient ties with the United States, their motions to dismiss for lack of personal jurisdiction should be denied.

### The Credit Card Companies Are 'At Home' In Virginia

Even if Section 12 did not apply to this case, general jurisdiction is proper because of the vast contacts both parties have with the Commonwealth of Virginia, even in light of the Supreme Court's decisions in *Goodyear* and *Daimler*. While neither defendant is incorporated nor headquartered in Virginia, they both have expansive ties with the Commonwealth that exceeds those of the defendants in *Goodyear* and *Daimler*.

The Supreme Court has specifically acknowledged that neither the *Goodyear* nor *Daimler* cases stands for the proposition that a "corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has a principal place of business." *Daimler*, 134 S. Ct. at 760 (emphasis added). Instead, it rejected allowing courts to exercise general jurisdiction based solely on a test of whether the corporation engaged in a substantial, continuous, and systematic course of business. *Id.* at 761. For general jurisdiction to apply, it held, the defendants' affiliations with the state in which the suit is brought must be "so constant and persuasive as to render it essentially at home in the forum state." *Id.* at 751.

11

As previously discussed, the Credit Card Companies each have substantial ties with Virginia that satisfy the test not only for venue purposes under Section 12, but even for general jurisdiction purposes. MasterCard contracts with Virginia to allow her citizens to accept tax refunds on MasterCard debit cards. MasterCard Debit Card. Virginia Tax Refund Debit Card, Va. Dept. of Taxation, http://www.tax.virginia.gov/content/refund-debit-cards. Visa has an expansive facility, staffed by a great number of employees, in Ashburn that has been compared to a fortress and even has a moat. Jon Swartz, *Top Secret Visa Data Center Banks on Security, Even has Moat*, USA Today (March 25, 2012, 5:27 PM), http://usatoday30.usatoday.com/tech/news/story/2012-03-25/visa-data-center/53774904/1. Both corporations are comfortably at home in Virginia.

### III.

### THE SHERMAN ACT CLAIM

DataCell has pled multiple conspiracies entered into by each defendant. DataCell has alleged that, along with the Government Officials, the Credit Card Companies conspired to harm DataCell by attacking its ability to process credit card donations from supporters. It has also alleged that Visa and MasterCard each conspired with Teller, when they instructed the credit card processing company to cease processing DataCell's credit card transactions. These conspiracies

separately violated Section 1 of the Sherman Act, which prohibits contracts, combinations, and conspiracies in the restraint of trade or commerce. 15 U.S.C. § 1.

The fact that the complaint lacks superfluous details does not result in it failing to meet the pleading standard. Instead, DataCell has efficiently explained the details of a simple but successful set of conspiracies that caused it direct harm.

## Standard of Review

A motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint. *Randall v. U.S.*, 30 F.3d 518, 522 (4th Cir. 1994). Moreover, the complaint is to be liberally construed in favor of plaintiff and must be assessed in light of Rule 8's liberal pleading standards, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In *Ashcroft v. Iqbal*, the Supreme Court expanded upon *Twombly* by developing a two-pronged analytical approach to be followed in any Rule 12(b)(6) test. 556 U.S. at 679. First, a court must identify and reject legal conclusions unsupported by factual allegations because they are not entitled to the presumption of truth. *Id.* at 680. Second, assuming the veracity of "well-

13

pleaded factual allegations," a court must conduct a "context-specific" analysis drawing on "its judicial experience and common sense" and determine whether the factual allegations "plausibly suggest an entitlement to relief." *Id.* at 679-681.

### The Conspiracies

Contrary to the assertions from the Credit Card Companies, DataCell has met the pleading standard explained in *Twombly,* 550 U.S. at 556-57 and *Iqbal,* 556 U.S. at 678-80. Indeed, it has pled far more than simple parallel conduct. The complaint explains how the Government Officials instructed their respective staffs to contact the Credit Card Companies in hopes of convincing them to block donations to Wikileaks. Compl. ¶15. Then, on the exact same day, both defendants instructed Teller to suspend the processing of such donations immediately. Compl. ¶17. These concerted actions successfully prevented DataCell from being able to receive credit card payments in support of Wikileaks. Compl. ¶18.

These actions amounted to a conspiracy for purposes of the Sherman Act. First, the Credit Card Companies actions were coordinated through intermediaries: the Government Officials and their respective staffs. Second, each Credit Card Company conspired independently with the Government Officials in order to harm DataCell and Wikileaks. This amounts to more than simple parallel conduct. It is independent and actionable parallel conspiracies.

14

These conspiracies, however, are not the only concerted actions taken by the Credit Card Companies that violated the Sherman Act. In addition to the "horizontal conspiracy" explained above, each defendant also engaged in "vertical conspiracies" with Teller and Valitor, each of whom are part of the downstream market for the processing of credit card transactions. Compl. ¶ 26.

In determining whether a vertical restriction on trade constitutes an unlawful antitrust conspiracy, the relevant inquiry is (1) whether the restriction has a pernicious effect on competition, and (2) if so, whether the restriction is reasonably necessary to achieve redeeming pro-competitive benefits that outweigh its harms. *Cont'l T.V. v. GTE Sylvania*, 433 U.S. 36, 50 (1977). This inquiry is governed by a rule of reason standard, under which all relevant circumstances are weighed, including related agreements that affect competition in the relevant market. *Id.* at 49.

The Credit Card Companies' conspiracies with Teller and Valitor had a pernicious effect on competition. As is fully described, *infra*, the Credit Card Companies' agreement to restrain payments to DataCell suppressed DataCell's ability to participate as a member of the news media marketplace.

**DataCell Is A Participant In the News Media Marketplace**

The Supreme Court has long held that the relevant product market with respect to antitrust cases is narrowed to those in which

15

"commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce.'" *U.S. v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). Citing this case, the Fourth Circuit explained that a "'relevant market', then, is the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market." *Satellite Television & Associated Res's., Inc. v. Cont'l Cablevision of Va, Inc.*, 714 F.2d 351, 356 (4th Cir. 1983). "[F]ailure to plead a relevant product market rarely is grounds for dismissal because market definition is a deeply fact-intensive inquiry for which discovery generally is necessary. The proper market definition in [some] case[s] can be determined only after a factual inquiry into the commercial realities faced by consumers. *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 2015 U.S. Dist. LEXIS 24696, at *17 (D. Md. Mar. 2, 2015) (*citing E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 444 (4th Cir. 2011)) (internal citations and quotations omitted).

In *Satellite Television*, an antitrust case involving competing cable television companies, the court held that the "relevant market" was not only cable television, but also "cinema, broadcast television, video disks and cassettes, and other types of leisure and entertainment-related businesses for customers who live in single-family dwellings and apartment houses..." *Satellite Television*, 714 F.2d at 355. While this

Court has previously held that "the internet" is too broad to constitute a market, the news media market—comprised of a limited number of traditional and electronic information providers—is closer to the expansive entertainment market in *Satellite* than the amorphous "internet" non-market in *America Online. See America Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 858 (E.D. Va. 1999).

DataCell is a member of the news media. *See* Compl. ¶ 29. At first blush, this may seem like a broadly defined market. The competition between participants in the news media marketplace is so widespread, however, that any attempts to limit it for purposes of market definition would be futile. Indeed, in the dissemination of information to the general public, traditional media outlets, such as newspapers, radio, and television compete not only with each other, but also with new media outlets, such as blogs, podcasts, and dedicated Internet sites, such as Wikileaks.

While the Credit Card Companies have painted DataCell as merely a provider of services to Sunshine Press and Wikileaks, its actual position in the enterprise is far more expansive. *See* Compl. ¶ 7, 8, 10, 11, 19, 23, Ex. A. Indeed, DataCell partnered with Sunshine Press in the production of Wikileaks. Sunshine Press provided the content and sources. DataCell provided the server storage and the technical support necessary to allow Wikileaks to publish its content to Internet users worldwide. Moreover, the Teller contract overtly recognizes that both

DataCell and Sunshine Press were customers for credit card processing services. Compl. Ex. A.

### DataCell Has Antitrust Standing

As Visa points out, *Kloth v. Microsoft*, 444 F.3d 312, 324 (4th Cir. 2006), explains the five factors that are weighed in determining antitrust standing: (1) the causal connection between the violation and the harm, (2) whether the harm was of the type for which Congress intended to provide a private remedy, (3) the directness of the injury, (4) the existence of more direct victims, and (5) problems of identifying damages among various victims.

**DataCell's direct injury.** DataCell suffered a direct injury that was caused by the Credit Card Companies' violations of the Sherman Act. Its injuries were of the type foreseen by Congress in adopting that legislation.

As defendants point out, antitrust laws were enacted to protect competition rather than competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). As previously explained, DataCell partnered with Sunshine Press in the news media marketplace in order to provide worldwide access to the Wikileaks website. The venture was a success. Anyone with uncensored access to the Internet was given access to the material obtained by Wikileaks, such as the diplomatic cables. Compl. ¶ 11.

18

While the Credit Card Companies attack Wikileaks with familiar insults, the truth is that such revelations are within the long-established tradition of a free news media. While the publication of the Pentagon Papers over fifty years ago and the more recent publication of classified reports by Edward Snowden are surely controversial, they are protected speech under the First Amendment.

The Government Officials in this case, however, attempted to find a way around the prior restraint doctrine explained in the *Pentagon Papers* case, *New York Times v. U.S.*, 403 U.S. 713 (1971). Instead of seeking an injunction, they sought out nongovernmental means to attack Wikileaks. They convinced Visa and MasterCard to halt DataCell's ability to process credit card payments, in an attempt to suffocate Wikileaks. When the Credit Card Companies did so, they directly targeted Teller's contract with DataCell, which also listed Sunshine Press as an alternate name.

This action would have been similar to the government officials in the *Pentagon Papers* case attempting to circumvent an injunction by engaging in a conspiracy with paper distributors to deny the newspapers with the paper needed to publish their revelations. Such an act would have harmed competition in the news media marketplace, just as the actions of the Government Officials and the Credit Card Companies have done in this case.

Moreover, the harm suffered by DataCell and Wikileaks is especially dangerous to the competition among participants in the news

19

media marketplace. This heavy-handed attack on DataCell sent a clear and dangerous message: publish content that is disfavored by the American government and risk financial ruin. This chilling effect on free speech is dangerous precedent, if it is allowed to proceed unchecked.

The Credit Card Companies attempt to justify their actions under the rule of reason because of unspecified laws that were supposedly broken by Wikileaks and because Congressman King criticized Wikileaks, by calling it a terrorist organization. Visa Inc.'s Memo. at 5; MasterCard Inc.'s Memo. at 16.  These excuses do not justify their decision to assume the role of Supreme Arbiter in the news media marketplace. Indeed, because of the Credit Card Companies' massive market share of the credit card market, they can silence almost any company, in most any marketplace throughout the world, either for their own selfish reasons or in order to ingratiate themselves to the government officials who are ultimately responsible for regulating their own marketplace.

**DataCell's damages are easily discernable.** It is true that both DataCell and Sunshine Press were harmed by the conspiracies of the Credit Card Companies. The existence in this case, however, of another victim does not foreclose DataCell's standing to bring this antitrust action. Indeed, the damages are easily discernable between the two injured partners: Wikileaks was entitled to 95% of the proceeds of credit card payments and DataCell was entitled to 5% of the proceeds. Evidence

presented at trial will explain and detail the damages suffered by DataCell as a result of the conspiracies.

### DataCell Has Standing Under Article III Of The U.S. Constitution To Bring These Claims

Standing is conferred to federal court plaintiffs who show that their case or controversy: (1) relates to a concrete and particularized injury in fact, (2) a causal connection between the injury and the alleged conduct of the defendant, and (3) is subject to redress by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). DataCell's injuries meet this standard and it has standing to bring this case in federal court.

As previously described, DataCell alleged that the Credit Card companies conspired with each other, with the Government Officials, and with Teller and Valitor in order to harm DataCell and Wikileaks. The result of this conspiracy is that DataCell was unable to process credit card transactions from Wikileaks supporters, from which it was entitled to 5% of the revenues. This is a concrete injury in fact that was directly caused by the conspiracies of the defendants. DataCell is not looking for prospective relief in the form of an injunction. Instead, DataCell will be made whole when a judgment is entered on its behalf and against the Credit Card Companies for the damages it suffered as a result of the conspiracies. As a result, DataCell meets the standing requirements under Article III of the U.S. Constitution.

21

## IV.

## VIRGINIA ANTITRUST ACT
## AND COMMON LAW TORTS[1]

In addition to its Sherman Act claim, DataCell also alleges violations of Virginia's Antitrust Act ("Virginia Act") (Count III), tortious interference with business expectancies and contract (Count II) and civil conspiracy (Count IV). DataCell has properly stated a claim in all three of these counts

### Virginia's Antitrust Act

The Virginia Act is parallel to the Sherman Act claim, and DataCell agrees with the Credit Card Companies that the arguments regarding the Sherman Act apply equally to the Virginia Act. The Credit Card Companies, however, also argue that Virginia Act should not apply because there is no nexus between the alleged bad acts of the defendants and the Commonwealth of Virginia. Visa Inc.'s Memo. at 24-25; MasterCard Inc.'s Memo. at 21-22. Visa suggests that DataCell is attempting to sue on behalf of Virginians who could not *pay* it money using Visa cards. Visa Inc.'s Memo. at 25.

---

[1] The Credit Card Companies argue that Virginia substantive law cannot apply to this case because of a lack of a nexus between Virginia and the defendants' acts. They do not, however, suggest which jurisdiction's substantive law should apply. Instead they analyze the common law claims pled in counts II and IV using Virginia law. DataCell will do the same. It will, however, gladly supplement its arguments should the Court find that the law of another jurisdiction is applicable to these claims.

DataCell's argument is essentially the converse. DataCell brought its claim under the Virginia Act because the Credit Card Companies' conspiracies prohibited DataCell from being able to *accept* money from its supporters in the Virginia market. Consequently, DataCell was unable to compete in Virginia and it was harmed.

Federal courts have previously recognized the validity of an antitrust action where large competitors collude to preclude smaller companies from competing in a geographic market. *Allen v. Dairy Farmers of Am., Inc.*, 748 F.Supp.2d 323, 353 (D. Vt. 2010). In *Allen*, local dairy farmers alleged that large dairy farm associations engaged in price-fixing and conspiracy to prevent the smaller competitors from being able to participate in the dairy market in the Northeastern United States. *Id.* at 331. The Court found that these claims could appropriately be brought as an antitrust case. *Id.* at 354.

Just as the dairy farmers were unable to compete in the Northeastern United States due to the large associations' concerted actions designed to financially cripple the farmers, DataCell was unable to compete in Virginia because of the Credit Card Companies' concerted actions designed to financially cripple DataCell.

For that reason, and for the reasons explained in Section III, the Credit Card Companies' motion should be denied as to it's Virginia Act claim in Count III.

**Tortious Interference With Business Expectancies and Contract**

DataCell properly alleged that the Credit Card Companies tortiously interfered with its business expectancies and contracts. The elements of this tort are: (1) a valid contract or business expectancy, (2) the defendants' knowledge of the contract or expectancy, (3) intentional interference by the defendants in inducing a breach or termination of the relationship, and (4) damage. *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 558-59 (2011). When the contract interfered with is at-will, then the plaintiff must also show that the defendants used improper methods when interfering with the contract. *Duggin v. Adams*, 234 Va. 221, 227 (1987).

DataCell alleged that the Credit Card Companies instructed Teller and Valitor to cease processing credit card transactions on behalf of DataCell, because of its association with Wikileaks. Compl. ¶ 17.  Such allegations clearly imply that the Credit Card Companies knew of the contracts with Teller and Valitor and that they knew that by interfering in those contracts that they would interfere with DataCell's ability to receive donations from Wikileaks supporters, from whom DataCell legitimately expected to receive payments. As previously explained in Section III, these acts were intentional and they caused DataCell financial harm.

The Credit Card Companies' methods of interference were also improper. Virginia courts consider methods of interference to be improper if they are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules. *Connolly*, 281 Va. at 558. Additionally, acts of unfair competition or unethical conduct may also be found to be improper, *Maximus, Inc. v. Lockheed Information Management Systems Co.*, 254 Va. 408, 414 (1997), as may acts that violate an established standard of a trade or profession. *Duggin*, 234 Va. at 228.

The statutory violations alleged in the Sherman Act claim and the Virginia Act claim both form a basis for the improper methods of the Credit Card Companies in interfering with DataCell's business expectancies and contracts. Even without the antitrust claims, however, DataCell can still show that the Credit Card Companies used improper methods, because their conduct violated an established standard of trade and involved the use of unfair competitive tactics. Indeed, as alleged in the complaint, together the Credit Card Companies, and their affiliates, controlled 95.5% of relevant credit card market share in 2010. Compl. ¶ 24. When both companies instructed Teller and Valitor to cease processing payments on behalf of DataCell, they effectively destroyed its ability to receive funds from its supporters. It is not normal for a credit card company to block individuals from transacting business with a company like DataCell. Indeed, it is highly unusual for credit card

companies to conspire with politicians to restrict a form of media that they subjectively deem bad. This divergence from normal business practices is evidence that the credit card companies used improper methods to tortiously interfere with DataCell's contract.

### Civil Conspiracy

DataCell alleged that the Credit Card Companies conspired with each other, with the Government Officials, with Teller, and with Valitor in a manner that caused it harm. The Credit Card Companies argue that DataCell has failed to plead an underlying unlawful act. DataCell disagrees.

A conspiracy or combination to inflict injury on another is actionable. *Dunlap v. Cottman Transmission Sys.*, LLC 287 Va. 207, 213 (2014). Such a conspiracy, however, must allege an unlawful act or purpose. *Id.* at 215. Tortious interference with business expectancy or contract qualifies as such an unlawful purpose. *Id.* at 218-19.

Not only has DataCell alleged that the Credit Card Companies violated the Sherman Act and the Virginia Antitrust Act, it has also alleged that they both tortiously interfered with DataCell's business expectancies and contracts. Consequently, it has stated a cause of action for civil conspiracy.

## V.

## <u>CONCLUSION</u>

DataCell respectfully requests that this Court deny Visa's and MasterCard's motions to dismiss. Should the Court decide otherwise, then DataCell requests leave to file an amended complaint.

Dated:  June 3, 2015

HARVEY & BINNALL, PLLC

/s/ Jesse R. Binnall

_____
Philip J. Harvey, VSB #37941
Jesse R. Binnall, VSB #79292
Louise T. Gitcheva, VSB #86200
717 King Street, Suite 300
Alexandria, Virginia  22314
(703) 888-1943
(703) 888-1930 – facsimile
pharvey@harveybinnall.com
jbinnall@harveybinnall.com
lgitcheva@harveybinnall.com
*Counsel for Plaintiff DataCell ehf.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 3rd, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to the following:

Andrew S. Tulumello, *pro hac vice*
Robert Gonzalez, *pro hac vice*
Jacob Siler, VSB # 80934
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 955-8500 – telephone
(202) 467-0539 – facsimile
Atulumello@gibsondunn.com
Rgonzalez2@gibsondunn.com
Jsiler@gibsondunn.com
*Counsel for Defendant Visa, Inc.*

Stephen E. Noona, VSB # 25367
Mark E. Warmbier, VSB # 77993
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
(757) 624-3000 - telephone
(757) 624-3169 – facsimile
senoona@kaufcan.com
mewarmbier@kaufcan.com
*Counsel for Defendant MasterCard Incorporated*

Martin S. Hyman, *pro hac vice*
Golenbock Eiseman Assor Bell & Peskoe LLP
437 Madison Avenue, 35th Floor
New York, NY 10022
(212) 907-7300 - telephone
(212) 754-0777 – facsimile
mhyman@golenbock.com
*Counsel for Defendant MasterCard Incorporated*

/s/ Jesse R. Binnall
_____

Jesse R. Binnall