UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| DATACELL EHF., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil No. 1:14-cv-1658-GBL-TCB |
| | ) |
| VISA INC., VISA EUROPE LTD., and | ) |
| MASTERCARD INCORPORATED, | ) |
| | ) |
| Defendants. | ) |

## DEFENDANT VISA INC.'S REPLY
## IN SUPPORT OF ITS MOTION TO DISMISS

DataCell's Opposition cannot rescue this case from dismissal. Rather than defend the
Complaint, DataCell resorts to new theories and purported "facts" raised for the first time in its
brief. These belated arguments cannot paper over the glaring deficiencies in DataCell's seven-
page Complaint. To the contrary, the futility of DataCell's newly minted arguments underscores
why the Complaint should be dismissed with prejudice.

## ARGUMENT

### I.   This Court Lacks Personal Jurisdiction Over Visa Inc.

DataCell fails to offer any compelling or legally defensible reason why Visa Inc. should
be subject to jurisdiction in Virginia. DataCell does not provide factual allegations to support the
claim that Visa Inc. is "at home" in Virginia for purposes of general jurisdiction, nor does
DataCell contend that any conduct occurred in Virginia that could confer specific jurisdiction.
Opp. 11-12. DataCell instead relies on Section 12 of the Clayton Act and urges the Court to
follow a "national contacts" test. Opp. 9-10. DataCell *concedes* that this Circuit has not decided
whether the exercise of personal jurisdiction pursuant to a "national contacts" test is consistent
with due process. Opp. 10. Neither the Supreme Court nor the Fourth Circuit has resolved this

issue.  Mot. 11.  That test is squarely inconsistent with the due process principles most recently set forth by the Supreme Court in *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014), and *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853-54 (2011).  Indeed, rather than address those cases, DataCell cites case law that vastly predates them.  Opp. 9-10. For example, DataCell relies primarily on *United States v. Scophony Corp. of America*, 333 U.S. 795 (1948), which held that a British corporation could be "found in" New York under Section 12's service-of-process provision because it had opened an office and had a "continuous course of business" in New York and the lawsuit related to that business in New York.  *Id.* at 810-11, 818.  *Scophony* does not suggest that it would be consistent with due process to hold a corporation to answer in a jurisdiction in which it is not a resident and where none of the alleged injuries or conduct at issue occurred.  *Daimler* and *Goodyear* hold precisely the opposite.[1]

In addition, DataCell claims without explanation that *Daimler* and *Goodyear* do not apply because they involved state long-arm statutes, as opposed to a federal statute like the antitrust laws at issue in this case.  Opp. 10.  But there is no support for the proposition that an act of Congress is somehow immune from the due process guarantees enshrined in the Constitution, or that *Daimler*'s due process requirements should be disregarded if a corporation has any "national contacts" with the United States.  In sum, DataCell has failed to explain how— in light of *Daimler* and *Goodyear*—its lawsuit can be heard in Virginia in a manner consistent with fundamental principles of due process.

---

[1]  Visa Inc. joins in the jurisdictional arguments presented by MasterCard.

**II.     DataCell Has Not Shown That It Has Standing To Bring Its Antitrust Claims.**

**A.     DataCell Lacks Article III Standing.**

DataCell contends that it suffered a "direct injury" caused by Visa Inc., but nowhere does DataCell adequately allege the nature of that purported injury.  Opp. 18-19.  DataCell claims *in its briefing papers* that the injury it has suffered is harm to "competition in the news media marketplace."  Opp. 19.  But DataCell can point to no allegation *in its Complaint* to support the claim that there is a definable "news media market," or that DataCell is a participant in it.  As alleged *in the Complaint*, DataCell is a service provider that provides "server hosting and technical support" to Sunshine Press/Wikileaks.  Compl. ¶ 7-8.  Thus, *according to the Complaint*, DataCell is not a participant in the "news media market," and any injury to that market is not an injury suffered by DataCell that DataCell can assert for standing purposes.  A plaintiff cannot make up facts out of whole cloth during briefing and use those facts to establish standing.  *See, e.g.*, *Lindsey-Grobes v. United Airlines, Inc.*, No. GJH-14-00857, 2014 WL 5298030, at *5 (D. Md. Oct. 14, 2014) ("[A]n opposition to a motion to dismiss . . . is no place for a Plaintiff to add material facts to a deficient complaint."); *Davis v. Cole*, 999 F. Supp. 809, 813 (E.D. Va. 1998) (same).

DataCell also suggests that it was damaged because it was entitled to 5% of donations to Wikileaks.  Opp. 20-21.  But this allegation cannot support DataCell's standing to bring a federal *antitrust* claim.  DataCell did not raise this damages allegation in Count I, its Sherman Act claim.  *See* Compl. ¶¶ 22-30.  The only injury that DataCell has pled in connection with Count I is the alleged "suppress[ion] [of] the marketplace of ideas."  *Id.* ¶ 29.  DataCell references the 5% amount in Count II for tortious interference under Virginia law.  *Id.* ¶¶ 32-33.  But the Complaint nowhere incorporates those allegations into Count I, and thus they are not relevant to DataCell's argument, given the well-settled rule that standing must be addressed on a claim-by-claim basis.

3

*See, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352-53 (2006) ("[P]laintiff must demonstrate standing for each claim he seeks to press.") (citing *Allen v. Wright*, 468 U.S. 737, 752 (1984)); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[P]laintiff must demonstrate standing separately for each form of relief sought.").

Moreover, even *assuming* that DataCell's 5% allegation could be considered as part of its antitrust claim (which it cannot), the key requirements for Article III standing of redressability and causation cannot be satisfied.  On redressability, ordering Visa Inc. to pay damages would do nothing to redress the "injury" to the "marketplace of ideas" DataCell alleges.  Mot. 16. DataCell concedes that it is not seeking any form of prospective relief (Opp. 21), and it is entirely inscrutable how a monetary judgment for DataCell would improve the "marketplace of ideas"—in any event, DataCell does not make any factual allegations addressing this point.

Similarly, with respect to the causation requirement of Article III, DataCell has no response at all to Visa Inc.'s argument that DataCell's alleged injury is far removed from any of Visa Inc.'s conduct, and that the chain of causation is broken by the actions of concededly independent third parties.  Mot. 14-15; *see also, e.g.*, *Allen*, 468 U.S. at 759 (holding that plaintiffs lacked standing because "[t]he chain of causation . . . involve[d] numerous third parties . . . and [their] independent decisions").  DataCell does not even attempt to explain why the admittedly independent conduct of Visa Europe, PBS/Teller, Korta, and Valitor should all be attributed back to Visa Inc. for standing purposes.  Article III standing requirements exist to prevent precisely the type of claim at issue here—an alleged injury to the ephemeral "marketplace of ideas" resulting from a domino-like cascade of concededly independent decision-making from which Visa Inc. is multiple steps removed:

4

> Visa Inc. Purportedly Directs Suspension → Visa Europe Directs Suspension → PBS/Teller Directs Suspension → Korta Suspends Payments → Injury to the Media Market → Sunshine Press's Injury → DataCell's Injury

*See Allen*, 468 U.S. at 759 (rejecting standing where "[t]he links in the chain of causation between the challenged [conduct] and the asserted injury are far too weak"); *Friends of Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 323-24 (4th Cir. 2002) (holding that injury was not fairly traceable to defendant because it was caused by choices of third parties not before the court).

### B.  DataCell Also Lacks Antitrust Standing Because It Has Not Alleged Injury To Competition In A Relevant Economic Market.

Even if DataCell can establish Article III standing, it has failed to allege that it has antitrust standing, an essential element of which is *antitrust injury*.  The "absence of antitrust injury is alone fatal." *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 850 F. Supp. 470, 476 (E.D. Va. 1994), *aff'd*, 57 F.3d 1317 (4th Cir. 1995) (internal quotation marks omitted); *see also Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 931 (4th Cir. 1990).  DataCell again simply makes the conclusory statement that "[i]ts injuries were of the type foreseen by Congress in adopting [the antitrust laws]."  Opp. 18.  But antitrust standing is not conferred by *ipse dixit*.

DataCell does not dispute that to establish antitrust injury, it must allege injury to **(1)** "*competition as a whole*," **(2)** "*within the relevant market*."  *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 708 (4th Cir. 1991) (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)) (emphases added).  But DataCell fails to allege either element of antitrust injury.

**Failure to allege a relevant market.**  DataCell's Opposition contends that the relevant market is the "news media marketplace."  Opp. 15, 19-20.  That is different than what DataCell alleged in its Complaint; in the Complaint, the relevant market was the "marketplace of ideas."  Compl. ¶ 29.  Again, this Court need not accept as true assertions that DataCell has made for the first time in its Opposition.  *See supra* p. 3.  But even accepting that DataCell has amended its

Complaint through its Opposition to plead a "news media marketplace," the Complaint must still be dismissed for lack of antitrust injury.

DataCell has not sufficiently alleged that either the "marketplace of ideas" or the "news media market" is a relevant economic market in which DataCell actually participates, and in which goods or services are sold or exchanged between producers and consumers. Nor has DataCell attempted to allege a relevant geographic market.

The marketplace of ideas—whatever that may be—is not an economic market consisting of producers and consumers. Nor is there any allegation that Visa Inc. or DataCell participate in that market.

Similarly, the "news media market" mentioned in DataCell's brief is sweepingly overbroad, and DataCell does nothing to define or cabin it. That is fatal. Indeed, this Court has dismissed a Sherman Act claim on a motion to dismiss for failure to plead a relevant market in circumstances very similar to those here. *See Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 857 (E.D. Va. 1999) (Lee, J.). There, America Online ("AOL") sued defendants who sent spam email advertisements to AOL members. Defendants counterclaimed under the antitrust laws, alleging that AOL abused its monopoly power by blocking the spam emails from reaching AOL subscribers. *Id.* at 853-54. Defendants argued that "email advertising to AOL subscribers" was the relevant market. *Id.* at 858. This Court concluded that the alleged market was legally insufficient to survive Rule 12(b)(6), both because the "product" was improperly limited to AOL subscribers and because the Internet "cannot be defined with outer boundaries." *Id.*

Similarly, here, the "news media market" and the "marketplace of ideas" cannot be defined with outer boundaries. DataCell *admits* that the market on which it relies cannot be defined. According to DataCell, the news media market is "broadly defined," so much so that

"any attempts to limit it for purposes of market definition would be futile." Opp. 17. That is a material concession. Because it would be "futile" to define the market DataCell now proposes, DataCell's allegation of a "marketplace of ideas" (Compl. ¶ 29) or a "news media market" (Opp. 17) is legally insufficient, and dismissal is appropriate on that basis. *See Am. Online*, 49 F. Supp. 2d at 858-59.

DataCell cites *Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Virginia, Inc.*, 714 F.2d 351 (4th Cir. 1983), but that case is inapposite. There, the Fourth Circuit affirmed a market definition accepted by the district court—which was also not disputed by the parties on appeal—consisting of "cinema, broadcast television, video disks and cassettes, and other types of leisure and entertainment-related businesses for customers who live in single-family dwellings and apartment houses." *Id.* at 355 (internal quotation marks omitted). The markets discussed by DataCell—the marketplace of ideas, or the news media market—are vastly more amorphous than the uncontested market at issue in *Satellite Television*. Both markets, like the Internet market alleged in *America Online*, are boundless and ill-defined. It is self-evident that a market including all "ideas" is essentially infinite. *See* 49 F. Supp. 2d at 858. And a market of all news media, without more, is also infinite, as it would (as DataCell concedes, Opp. 17) sweep in every newspaper, magazine, broadcast and cable news and informational program, every website, blog post, and tweet, without any support for the economic concept of "reasonable interchangeability" required by this Court's cases.[2]

---

[2] "[I]n order to determine whether any antitrust violation has occurred, 'we must first define the relevant market.'" *Berlyn Inc. v. Gazette Newspapers, Inc.*, 73 F. App'x 576, 582 (4th Cir. 2003) (quoting *Satellite Television*, 714 F.2d at 355). "The relevant market must be a product market, whose boundaries are defined not by the consumers but by the products or producers themselves." *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 994 (N.D. Cal. 2010) (citing *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)); *see also United States*
*(Cont'd on next page)*

As a last resort, DataCell suggests that market definition is a factual question that should be decided at some later stage of this litigation.  Opp. 16 (citing *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, _ F. Supp. 3d _, 2015 WL 898146 (D. Md. 2015)).  But this Court has squarely held the opposite.  *Am. Online*, 49 F. Supp. 2d at 858-59.  Indeed, this Court has not hesitated to dismiss federal antitrust claims at the motion-to-dismiss stage for failure to plead a relevant market.  *Id.*  As this Court held, "[w]hile proper market definition is often determined after a factual inquiry into the commercial realities faced by consumers, an antitrust plaintiff *must still allege a legally sufficient relevant market*" at the pleading stage.  *Id.* at 858 (emphasis added; citation omitted).  Here, DataCell has failed to plead or define a relevant market.  And the case upon which DataCell relies also makes clear that courts should dismiss when there is a "glaring deficiency" in the pleading of market, "such as if a claimant does not plead a relevant market at all."  *Intellectual Ventures*, 2015 WL 898146, at *17 (alteration and internal quotation marks omitted); *see also Mathias*, 152 F. Supp. 2d at 483 (dismissing antitrust claim for pleading a "contradictory" or "vague" market); *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 338-39 (D. Vt. 2010) (collecting cases).

**Failure to allege injury to competition in a market.**  As a separate and independent ground warranting dismissal, DataCell also fails to allege any *harm to competition* in any market,

---

*(Cont'd from previous page)*

v. *E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956); 2A Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 531, at 232-46 (3d ed. 2007).  At its simplest, a product market is defined as "those producers providing customers of a . . . firm (or firms) with alternative sources for the [firm's] product or service."  2A Areeda & Hovenkamp ¶ 530a, at 225.  The scope of a product market is generally defined based on cross-elasticity of demand, also known as "reasonable interchangeability of use."  *Am. Online*, 49 F. Supp. 2d at 858.  In addition to the basic product market, a plaintiff seeking relief under the Sherman Act must allege a relevant, defined geographic market.  *E.I. du Pont de Nemours v. Kolon Indus., Inc.*, 637 F.3d 435, 441-42 (4th Cir. 2011); *see also Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 480 (S.D.N.Y. 2011).

be it the "marketplace of ideas" or the "news media market."  As Visa Inc. explained in its motion to dismiss, DataCell has failed to show any anticompetitive injury inflicted on consumers or competitors within any relevant market.  Mot. 17-18.  DataCell's Opposition does not explain how its purported injury resulted from a harm to competition in any definable market.

DataCell contends that Visa Inc.'s conduct has "harmed competition in the news media marketplace."  Opp. 19.  To support this novel theory, DataCell relies on *New York Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam), a First Amendment case involving the leak of the Pentagon Papers that has no discernible connection to antitrust law.  Opp. 19.  Nowhere does DataCell explain how competition in a market has actually been harmed by the conduct alleged in this case.  Moreover, DataCell is neither a competitor nor a consumer in the news media market and therefore could not have suffered antitrust injury in that market.  *See Norris v. Hearst Trust*, 500 F.3d 454, 466 (5th Cir. 2007) ("Plaintiffs are neither consumers (buyers of advertising, or users of advertising such as subscribers) nor competitors (sellers of advertising) in the relevant market.  Plaintiffs have not suffered antitrust injury.").[3]

Similarly, DataCell has not shown injury *to competition* in a relevant market based on its claim that it was deprived of 5% of the payments that would have been made to Wikileaks.  Opp. 20.  It is well-settled that *economic* injury is not the same as *antitrust* injury; even if a party alleges economic injury, it does not establish antitrust standing if its injury does not flow from an injury to competition in a relevant market.  *See Oksanen*, 945 F.2d 708 (concluding that plaintiff

---

[3]   In its Complaint, DataCell alleged that it was a service provider for Sunshine Press.  Compl. ¶¶ 7-8.  In its Opposition, DataCell contends that it has an "expansive" role in Sunshine Press and the Wikileaks "enterprise."  Opp. 17.  DataCell cannot amend its Complaint in its briefing papers and, in any event, both the "marketplace of ideas" and the "news media market" are "boundless" and, as DataCell concedes, it would be "futile" to define them.  Opp. 17.

cannot prove antitrust injury "merely by showing that [the alleged conduct] caused him an economic injury"); *Am. Online*, 49 F. Supp. 2d at 859 (same); *see also Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 77 (2d Cir. 2013) (concluding that lost revenue did not constitute antitrust injury); *Long v. Mountain Trust Bank*, No. 77-0189, 1981 WL 2226, at *6 (W.D. Va. July 24, 1981). Indeed, even when a plaintiff alleges that it has entirely gone out of business due to a defendant's conduct, that injury may be insufficient to show antitrust injury if the plaintiff "fail[s] to allege any anti-competitive conduct." *Am. Online*, 49 F. Supp. 2d at 860. DataCell makes no effort to explain how any pecuniary harm it allegedly sustained harmed *competition* in any of the potential markets that it has floated.

## III.   DataCell Has Failed To State A Claim Under The Sherman Act.

Because DataCell lacks standing—both under Article III and antitrust standing—this Court may dismiss DataCell's antitrust claims and go no further. But in the event that the Court considers whether DataCell has plausibly stated a claim for relief under the Sherman Act, it is obvious that DataCell's allegations are insufficient.

### A.   DataCell Has Failed To Plausibly Allege A Conspiracy.

Visa Inc. explained in its motion to dismiss that DataCell had alleged parallel conduct at its most basic. Mot. 20-22. Rather than refute the arguments presented by Visa Inc., DataCell shifts its theory and alleges multiple new conspiracies not found in the Complaint. This Court need not consider the new factual allegations that DataCell has interspersed throughout its Opposition. *See supra* p. 3. But even if the Court were to consider those allegations, both of the newly alleged conspiracies are baseless.

In its Complaint, DataCell alleged that "[t]he defendants successfully conspired with each other" to suspend payment processing. Compl. ¶ 23. DataCell has now *entirely abandoned* that theory of conspiracy. Opp. 14-15. Instead, DataCell dreams up two new "independent" and

"parallel" conspiracies.  Opp. 14.  According to DataCell, Visa Inc. conspired with then-Senator Lieberman and Representative King to suspend payments.  Opp. 14.  DataCell contends that "each Credit Card Company conspired *independently* with the Government Officials in order to harm DataCell and Wikileaks."  *Id.* (emphasis added).  In addition, DataCell contends that each defendant also *independently* conspired with PBS/Teller and Valitor.  Opp. 15.

Even if the Court were to consider these newly minted theories, nothing about them can remotely justify a plausible antitrust claim under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  DataCell has again at most alleged parallel, independent action.  Indeed, DataCell admits that Visa Inc. and MasterCard engaged in "independent and . . . parallel" conduct with the members of Congress.  Opp. 14.  Nowhere has DataCell alleged specific facts that would show an actual agreement between Visa Inc. and members of Congress, or that Visa Inc. and MasterCard knew that the other party had also allegedly agreed with those members of Congress.  Under *Twombly*, parallel conduct and unilateral action of the sort alleged here, without more, do not satisfy the plausibility standard.  550 U.S. at 564-66.[4]

The same is true for DataCell's claim that Visa Inc. conspired with PBS/Teller and Valitor.  Opp. 15.  DataCell contends for the first time in its Opposition that "each defendant also engaged in 'vertical conspiracies' with Teller and Valitor, each of whom are part of the

---

[4]  Moreover, the new "conspiracy" based on interactions with government officials is plainly barred under the *Noerr-Pennington* doctrine.  The *Noerr-Pennington* doctrine provides that "[t]he federal antitrust laws do not regulate the conduct of private individuals in seeking anticompetitive action from the government."  *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 379-80 (1991).  "For purposes of *Noerr-Pennington*, there is no distinction between petitioning government officials and conspiring with them."  *GF Gaming Corp. v. Black Hawk, Colo.*, 405 F.3d 876, 883 (10th Cir. 2005) (citing *Omni Outdoor Adver.*, 499 U.S. at 375).  Accordingly, there is no cognizable Sherman Act claim against Visa Inc. based on Visa Inc.'s alleged interactions with then-Senator Lieberman and Representative King.

downstream market for the processing of credit card transactions." *Id.*  But the only allegation found in the Complaint is that Visa Inc. "instruct[ed]" PBS/Teller and Valitor to suspend payment processing.  Compl. ¶ 23.  Again, aside from conclusory legal assertions of conspiracy, DataCell provides no plausible allegations that Visa Inc. actually reached an agreement with PBS/Teller or Valitor to restrain trade.  Thus, no alleged conspiracy—either the one alleged in the Complaint, or the two new and different conspiracies alleged in the briefing papers—can survive *Twombly*'s plausibility requirement.

### B.  DataCell Has Failed To Allege An Unreasonable Restraint Of Trade.

DataCell's Sherman Act claim also fails to allege an unreasonable restraint of trade.  *See* Mot. 22-24.  DataCell's opposition brief is silent on this point, which is not surprising, because the Complaint is devoid of allegations showing an unreasonable restraint of trade.

DataCell concedes that its antitrust claims should be considered under a "rule of reason" test, but that test requires evaluation of the purported agreement with respect to its "impact on competition as a whole within the relevant market."  *Oksanen*, 945 F.2d at 708-09; *see also Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002).  Because DataCell has not alleged a relevant economic market or alleged competitive harm in that market, DataCell *a fortiori* cannot adequately allege that Visa Inc. engaged in any unreasonable restraint of trade.

DataCell also fails to offer any conceivable economic motive for Visa Inc. and the other defendants to have entered into these purported agreements.  *See* Mot. 21-22; Opp. 14-17.  As Visa Inc. explained, both Visa Inc. and MasterCard had legitimate, independent reasons to suspend payment processing to Wikileaks, just as many other companies did at the same time (including Apple, Amazon, Western Union, and PayPal).  Mot. 22.  Indeed, Visa Inc. has rules in place that allow it to terminate agreements where a party is engaged in potentially illegal activity, or where the agreement could damage Visa's brand.  Mot. 21-22.  But DataCell simply ignores

these legitimate, independent reasons.  Moreover, DataCell makes none of the required

allegations that parties to an antitrust conspiracy (1) have an economic motive and (2) seek to

secure financial gains that would be impossible for them to achieve through unilateral conduct.

*See Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986) (if the

purported conspirators "had no rational economic motive to conspire, and if their conduct is

consistent with other, equally plausible explanations, the conduct does not give rise to an

inference of conspiracy").  Thus, DataCell's failure to allege an unreasonable restraint of trade

also independently dooms DataCell's claims.

## IV.    DataCell's Virginia-Law Counts Must Be Dismissed.

### A.    Virginia Law Cannot Constitutionally Apply In This Case.

Visa Inc. argued that under *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985),

Virginia law could not constitutionally be applied to the claims at issue in this case because

Virginia has no significant contacts with those claims.  Mot. 24-25.  DataCell responds to this

argument in a footnote.  Specifically, DataCell faults Visa Inc. because Visa Inc. has not

"suggest[ed] which jurisdiction's substantive law should apply."  Opp. 22 n.1.  But it is not Visa

Inc.'s burden to establish which substantive law should apply; that burden falls on the plaintiff in

this case, as DataCell chose to file suit in Virginia and bring claims under Virginia law.

DataCell also points to the fact that Visa Inc. has analyzed the state-law claims under Virginia

law.  *Id.*  But Visa Inc.'s motion to dismiss made clear that it was analyzing the plausibility of

the state-law claims under Virginia law only in the alternative, in the event the Court did not

accept Visa Inc.'s primary argument that Virginia law cannot constitutionally apply.  Mot. 25.  In

any event, DataCell has done nothing to save its claims under Virginia law, which must be

dismissed under *Shutts*—on the merits—under the well-established rule that a state cannot apply

its law to conduct that occurs outside its borders, *particularly* where, as here, none of the conduct giving rise to the Complaint occurred in Virginia.[5]

### B.   DataCell Has Failed To State A Claim Under The Virginia Antitrust Act.

DataCell concedes that any analysis under the Virginia Antitrust Act follows federal antitrust law.  Opp. 22.  Accordingly, should the Court choose to dismiss DataCell's federal antitrust claim, dismissal of the state antitrust claim should follow.[6]

DataCell seeks to establish a nexus between its claim and the Commonwealth of Virginia by suggesting that the alleged conspiracies "prohibited DataCell from being able to *accept* money from its supporters in the Virginia market," and thus "DataCell was unable to compete in Virginia."  Opp. 23 (emphasis in original).  Like some of the other facts raised in DataCell's

---

[5]  Federal courts regularly hold that state law cannot constitutionally be applied to conduct outside a state's borders under *Shutts*.  *See, e.g.*, *United States v. Shahani-Jahromi*, 286 F. Supp. 2d 723, 729-30 n.13 (E.D. Va. 2003) (noting that being subject to a forum state's jurisdiction "is insufficient by itself to justify application of the forum state's substantive law"); *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 84 (D. Md. 1991) (requiring that "sufficient contacts exist between the forum state and the claims asserted" to apply state law); *see also In re Ferrero Litig.*, 278 F.R.D. 552, 560 (S.D. Cal. 2011) (applying *Shutts* to reject claims of non-California residents under California law); *Herrera v. Michelin N. Am., Inc.*, No. B-07-114, 2009 WL 700645, at *12 (S.D. Tex. Mar. 16, 2009) (concluding that it would be "unfair to apply Texas law" because plaintiffs "have no ties at all to Texas" and have not alleged a connection between Texas and the conduct underlying the lawsuit).

[6]  This Court has diversity jurisdiction because this suit was brought by a foreign entity against citizens of different states.  *See* 28 U.S.C. § 1332(a)(2) (granting diversity jurisdiction over suits between "citizens of a State and citizens or subjects of a foreign state"); *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 91-92 (2002) (noting that a foreign corporation is considered a citizen of a foreign state under Section 1332).  Therefore, there is independent subject matter jurisdiction over the state-law claims, even if the Sherman Act claim is dismissed.  28 U.S.C. § 1332(a)(2).  And federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them."  *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).  Accordingly, this Court should decide the Virginia-law claims on the merits.  *See Ketema v. Midwest Stamping, Inc.*, 180 F. App'x 427, 428 (4th Cir. 2006) (holding that district court should have retained jurisdiction over state-law claims because there was complete diversity among the parties and "it would have been a waste of judicial resources" to dismiss the state-law claim without prejudice).

Opposition, these allegations cannot be found in the Complaint, thus they may be disregarded. *See supra* p. 3. The word "Virginia" appears only once in the allegations of the Complaint, with DataCell arguing that "Virginians were unable to use credit cards to pay DataCell and Sunshine Press." Compl. ¶ 38. DataCell's Opposition tries to convert this allegation into a claim that DataCell has *itself* been unable to "compete" in the "Virginia market." Opp. 23.

Although these allegations already push the bounds of reason, DataCell goes further and argues that it "was unable to compete in Virginia because of the Credit Card Companies' concerted actions designed to financially cripple DataCell." Opp. 23. Without rehashing the many reasons why DataCell's antitrust claims fall short, *see supra* pp. 5-13, it is clear that DataCell and Visa Inc. do not "compete" in any relevant market. Regardless of whether Virginians were able to make donations to Wikileaks, DataCell has not alleged that DataCell and Visa Inc. are both competitors in any relevant market, or that competition was harmed in any relevant market. Accordingly, DataCell's claim under the Virginia Antitrust Act must be dismissed.[7]

### C.   DataCell Has Failed To State A Claim For Tortious Interference Because It Cannot Establish That Visa Inc. Used Improper Methods.

Similarly, DataCell has no response to Visa Inc.'s argument that DataCell's claim for tortious interference must be dismissed. Opp. 24-26. DataCell does not dispute that in order to

---

[7] To support its argument under the Virginia Antitrust Act, DataCell cites *Dairy Farmers*, 748 F. Supp. 2d 323, a case in which local dairy farmers sued a large dairy farm association for allegedly shutting small dairy farmers out of the Northeast market. Opp. 23. That case has no bearing here. At most, it serves to highlight the structural flaws of DataCell's arguments. In *Dairy Farmers*, small dairy farms sued an association of other dairy farms—i.e., their direct competitors—for engaging in conduct that shut them out of a geographic market. Here, DataCell, a technical service provider to Sunshine Press and Wikileaks, has sued Visa Inc. and MasterCard. Whether in the news media market, the marketplace of ideas, or even the credit card payments market, these entities are simply not competitors in any way, shape, or form.

maintain a tortious interference claim against Visa Inc. under Virginia law, it must show that

Visa Inc. used "improper methods" to interfere with a contract.  Opp. 24.

Instead, DataCell rests its tortious interference claim on the argument that Visa Inc.'s

conduct "violate[d] an established standard of trade or profession and involved the use of unfair

competitive tactics."  Opp. 25.  While violations of a professional or trade standard may

conceivably constitute "improper methods," *see, e.g.*, *Duggin v. Adams*, 234 Va. 221, 228

(1987), here DataCell has alleged nothing of the sort beyond its invalid antitrust claims.

DataCell contends that Visa Inc.'s "divergence from normal business practice" (Opp. 26)

amounts to "improper methods," but there are no allegations in the Complaint to support this

assertion, and Visa Inc.'s operating rules plainly authorize it to terminate any relationship based

on potential illegality or potential harm to the brand.  Mot. 21-22 (citing Visa Inc. Core Rules

and Visa Product and Service Rules, at Core Rules-73).  DataCell's Complaint is devoid of any

allegation of a trade practice or industry standard with regard to suspension of payment

processing.  Compl. ¶¶ 31-35.  Its tortious interference claim under Virginia law therefore must

be dismissed.

### D.    DataCell Has Failed To Plead An Unlawful Act For Civil Conspiracy.

In order to support its civil conspiracy claim, DataCell must sufficiently allege some

unlawful act.  Mot. 28-29.  For the reasons explained in Visa Inc.'s motion to dismiss and in this

reply, DataCell cannot make out a plausible antitrust claim.  *Id.*; *supra* pp. 5-13.  The only

remaining possible "unlawful act" for purposes of a civil conspiracy claim would be the alleged

tortious interference.  Opp. 26.  But that claim is also grossly inadequate, for the reasons

explained in Visa Inc.'s motion and above.  Mot. 26-28; *supra* p. 16.  DataCell points to no other

unlawful act that could support a civil conspiracy claim under Virginia law.  Accordingly, should

this Court decide that DataCell's antitrust and tortious interference claims are meritless, the civil conspiracy claim must also be dismissed.

## V. DataCell Should Be Denied Leave To Amend.

DataCell argues in the alternative, without any citation or explanation or any suggestion about how it would amend, that if the Court decides to dismiss DataCell's claims, DataCell should be granted leave to amend its Complaint. Opp. 27. DataCell offers no compelling reason why, if its claims are dismissed for failure to state a claim, those claims should not be dismissed with prejudice. Dismissal with prejudice would serve the interests of justice and prevent DataCell from imposing further costs on Visa Inc. and further burdening the resources of the judiciary.

As an initial matter, this Court frequently requires that any formal request for leave to amend be accompanied by a proposed amended pleading. *See Williams v. Wilkerson*, 90 F.R.D. 168, 169-70 (E.D. Va. 1981). And other federal courts routinely deny leave to amend when a plaintiff fails to "submit[] a proposed amended complaint" or fails to even "proffer the substance of such an amended complaint" before the district court. *See, e.g.*, *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 884 (8th Cir. 2009). DataCell has not attached a proposed amended complaint, nor has it even suggested how it would amend its Complaint in order to save its claims. That alone is fatal to DataCell's request for leave to amend.

But even if this Court were to consider the request to amend, it is clear that any amendment would be futile and prejudicial. While granting leave to amend is within the Court's discretion, leave to amend should be denied when "the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986); *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999). Amendment would be futile,

17

for example, when a court lacks jurisdiction over the claims or parties, or when a plaintiff lacks standing. *See, e.g.*, *Nat'l Alliance for Accessibility, Inc. v. Millbank Hotel Partners*, No. RDB-12-3223, 2013 WL 4934479, at *2-3 (D. Md. Sept. 11, 2013) (denying leave to amend after the court determined the claims were moot and could not be cured by amendment); *Gambelli v. United States*, 904 F. Supp. 494, 498-99 (E.D. Va. 1995), *aff'd*, 87 F.3d 1308 (4th Cir. 1996) (denying plaintiff leave to amend in order to allege diversity jurisdiction); *Chandler v. Journey Educ. Mktg., Inc.*, No. 2:10-cv-00839, 2012 WL 4356838, at *9 (W.D. Va. Sept. 21, 2012) (denying leave to amend because plaintiff would lack standing to bring amended claims). Here, if the Court were to conclude that it does not have jurisdiction or that DataCell lacks standing to bring these claims, there is no amendment that DataCell could make that would cure those jurisdictional defects. Leave to amend would be futile.

If the Court decides that DataCell has failed to state a claim under the Sherman Act, any amendment to those claims similarly would be futile. DataCell has not defined any relevant economic market—whether in its Complaint or in its brief—nor has it sufficiently alleged any agreement in restraint of trade. *See supra* pp. 5-13. It is obvious that DataCell has no real antitrust theory for this case. Dismissal with prejudice is necessary to "avoid the potentially enormous expense of discovery in cases"—like this one—"with no reasonably founded hope that the discovery process will reveal relevant evidence to support a [Section 1] claim." *Twombly*, 550 U.S. at 559 (internal quotation marks and alterations omitted). DataCell offers no basis upon which it could possibly state valid claims; and granting it further opportunity to impose costs on Visa Inc. would be unfair, expensive, and prejudicial.

## CONCLUSION

For the foregoing reasons, Visa Inc. respectfully requests that this Court dismiss the Complaint with prejudice.

18

Dated:  June 19, 2015

Respectfully submitted,

 /s/Jacob S. Siler
Jacob Siler (Va. Bar No. 80934)
Andrew S. Tulumello (*pro hac vice*)
Robert Gonzalez (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, D.C.  20036
Tel: 202-955-8500
Fax: 202-467-0539
JSiler@gibsondunn.com
ATulumello@gibsondunn.com
RGonzalez2@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that, on this 19th day of June, 2015, I have electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following counsel of record:

Philip J. Harvey (Va. Bar No. 37941)
Jesse R. Binnall (Va. Bar No. 79292)
Louise T. Gitcheva (Va. Bar No. 86200)
HARVEY & BINNALL, PLLC
717 King Street, Suite 300
Alexandria, Virginia  22314
Tel: (703) 888-1943
Fax: (703) 888-1930
pharvey@harveybinnall.com
jbinnall@harveybinnall.com
lgitcheva@harveybinnall.com

*Counsel for DataCell ehf.*

Stephen E. Noona (Va. Bar No. 25367)
Mark E. Warmbier (Va. Bar No. 77993)
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, Virginia  23510
Tel: (757) 624-3000
Fax:  (757) 624-3169
senoona@kaufcan.com
mewarmbier@kaufcan.com

*Counsel for Defendant MasterCard Incorporated*

Pursuant to the Division-Specific Electronic Case Filing Policies and Procedures, two courtesy copies of the foregoing pleading will be delivered to Chambers within one business day of the electronic filing.

 /s/ Jacob S. Siler
Jacob S. Siler (Va. Bar No. 80934)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, D.C.  20036
Tel: 202-955-8500
Fax: 202-467-0539
JSiler@gibsondunn.com

*Counsel for Visa Inc.*