1

1     UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF VIRGINIA
2         ALEXANDRIA DIVISION

3

DATACELL EHF.                    )
4                                )
                                 )
5     VS.                        )  1:14-CV-1658  GBL
                                 )
6                                )  ALEXANDRIA, VIRGINIA
                                 )     JULY 10, 2015
7                                )
VISA INC., VISA EUROPE LTD.,     )
8 AND MASTERCARD INCORPORATED    )
_____ )

9

10

11

12

13
      _____

14
              **TRANSCRIPT OF MOTIONS HEARING**
15      **BEFORE THE HONORABLE GERALD BRUCE LEE**
             **UNITED STATES DISTRICT JUDGE**
16    _____

17

18

19

20

21

22

23

24  **Proceedings reported by stenotype, transcript produced by**

25  **Julie A. Goodwin.**

1                          A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:
            HARVEY & BINNALL, PLLC
4           By:  MR. JESSE R. BINNALL
            717 King Street
5           Suite 300
            Alexandria, Virginia  22314
6           703.888.1943
            jbinnall@harveybinnall.com
7

8

9    FOR THE DEFENDANT MASTERCARD INCORPORATED:
            KAUFMAN & CANOLES, P.C.
10          By:  MR. STEPHEN E. NOONA
            150 West Main Street
11          Suite 2100
            Norfolk, Virginia  23510
12          757.624.3000
            senoona@kaufcan.com
13
            GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
14          By:  MR. MARTIN S. HYMAN
            437 Madison Avenue
15          35th Floor
            New York, New York  10022
16          212.907.7300
            mhyman@golenbock.com
17

18

19   FOR THE DEFENDANT VISA INC.:
            GIBSON, DUNN & CRUTCHER LLP
20          By:  MR. JACOB S. SILER
                     -AND-
21          MR. ANDREW TULUMELLO
            1050 Connecticut Avenue, NW
22          Washington, D.C.  20036
            202.955.8500
23          jsiler@gibsondunn.com
            atulumello@gibsondunn.com
24

25

                                      Julie A. Goodwin, CSR, RPR

3

1 **A P P E A R A N C E S**

2

3 OFFICIAL U.S. COURT REPORTER:
        MS. JULIE A. GOODWIN, CSR, RPR
4        United States District Court
        401 Courthouse Square
5        Tenth Floor
        Alexandria, Virginia  22314
6        512.689.7587

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 (JULY 10, 2015, 10:39 A.M., OPEN COURT.)

2          THE COURTROOM DEPUTY:  14-CV-1658, *DataCell ehf.*

3 *versus Visa, Inc., et al.*

4          THE COURT:  Good morning.

5          MR. BINNALL:  Good morning, Your Honor.  Jesse Binnall

6 on behalf of DataCell.

7          THE COURT:  Spell your last name for me.

8          MR. BINNALL:  That's B-I-N-N-A-L-L.

9          THE COURT:  Good morning.

10          MR. NOONA:  May it please the Court, Your Honor.

11 Stephen Noona on behalf of MasterCard.  I have with me

12 Mr. Martin Hyman who will be making the argument today for

13 MasterCard.

14          THE COURT:  Good morning, Mr. Hyman.

15            Good morning, Mr. Noona.

16          MR. TULUMELLO:  Good morning, Your Honor.  Drew

17 Tulumello, Gibson, Dunn & Crutcher, for Visa, Inc.

18          THE COURT:  Spell your last name for me.

19          MR. TULUMELLO:  T-U-L-U-M-E-L-L-O.

20          THE COURT:  Thank you, Mr. Tulumello.

21          MR. SILER:  Good morning, Judge.  Jacob Siler from

22 Gibson Dunn, also for Visa, Inc.

23          THE COURT:  Good morning, Mr. Siler.

24          MR. NOONA:  Your Honor, Stephen Noona one more time.

25 If it makes sense, there are two major issues on the motions

1    that are before you.  We propose to have Mr. Hyman address the

2    jurisdictional issues and Mr. Tulumello to take on the

3    substantive issues.  Both counsel are prepared to answer

4    questions on either of the topics, but we thought it would be

5    helpful to narrow down the topics and have one lawyer address

6    each.

7              THE COURT:  Brevity is the hallmark of great advocacy.

8    I welcome that suggestion.

9              MR. NOONA:  Thank you, Your Honor.

10             THE COURT:  Mr. Hyman, if you could tell us -- it's

11   always helpful to tell me at the outset, what is the issue

12   here?

13             MR. HYMAN:  The issue with regard to jurisdiction and

14   venue involves the determination as to whether or not the

15   complaint properly alleges personal jurisdiction and venue.

16             The facts are really simple.  They are not in

17   dispute.  MasterCard, Incorporated, is a Delaware holding

18   corporation with a principal place of business in New York.  It

19   has no employees in Virginia, no offices in Virginia, no

20   ongoing activities in the Commonwealth of Virginia.

21             The plaintiff, DataCell, is an Icelandic

22   corporation with no connection to Virginia.  It serves, in

23   essence, as a front for an entity called Sunshine Press, which

24   is better known as Wikileaks, another Icelandic company with no

25   discernible connection to Virginia.

1          Defendant Visa Europe is a United Kingdom --

2          THE COURT:  Plaintiff says that MasterCard has some

3     relationship with the Virginia government concerning tax

4     refunds.  Is that right?

5          MR. HYMAN:  No, it's not, Your Honor.  MasterCard,

6     Inc., as I indicated, is a holding company.  The documents that

7     were referred to in the plaintiff's opposition papers -- and I

8     would point out that the complaint in this case does not make

9     any jurisdictional allegations concerning personal

10    jurisdiction, nor does it make any allegations concerning

11    venue.

12          The papers that were submitted in opposition to the

13    motion attach a page from a website of the Virginia Department

14    of Taxation referring to a program pursuant to which Virginia

15    citizens can obtain tax refunds through a MasterCard debit

16    card.  The plaintiff makes this leap of faith and

17    mischaracterizes the program by saying, therefore, MasterCard,

18    Incorporated, has some connection to Virginia.

19          But as we pointed out in our reply papers, Your

20    Honor, that is not true.  The program that's being referred to

21    is a program that was administered and entered into between the

22    State of Virginia, Xerox, a company called Local Solutions,

23    which has nothing to do with MasterCard, and Comerica Bank,

24    which is simply a MasterCard licensee that issues MasterCard

25    debit cards.

1          THE COURT:  So to be clear, then, MasterCard that's

2    before the Court is a holding company based in New York that is

3    not responsible for the Virginia relationship between Comerica

4    Bank and MasterCard.  You're not doing business here.  Is

5    that -- that's part of --

6          MR. HYMAN:  It's not doing business.  It's not

7    transacting business.  It's not found here.

8          THE COURT:  Okay.

9          MR. HYMAN:  And the fact is that --

10         THE COURT:  These claims are related to activities

11   that MasterCard is doing in New York.  There's nothing

12   connected to Virginia.

13         MR. HYMAN:  Interestingly enough, Your Honor, the

14   assertion that MasterCard, Inc., is somehow involved in the

15   issuance of MasterCard debit cards or the acquisition of

16   MasterCard debit card transactions is also incorrect.  First of

17   all, MasterCard, Inc., is a holding company.  It doesn't do

18   that.

19         Second of all, its operating company, MasterCard

20   International, Incorporated, which is not before the Court, is

21   not an issuer of MasterCard cards.  It's not an acquirer of

22   MasterCard transactions.  It's simply a licensor of the

23   MasterCard trademark to independent banks, such as Comerica,

24   which issues the card or acquires the transaction.  So

25   MasterCard, Inc., has nothing to do with Virginia in this

1   regard.

2           THE COURT:  So you're saying that MasterCard, Inc.

3   would not be subject to personal jurisdiction under the

4   long-arm statute in any event?

5           MR. HYMAN:  In no event would it be.

6           THE COURT:  Well, what about section 12 of the Clayton

7   Act?  What about that?

8           MR. HYMAN:  Section 12 of the Clayton Act is primarily

9   a provision that deals with nationwide service of process and

10  venue.  Courts have interpreted it to also provide for personal

11  nationwide jurisdiction in antitrust cases.

12          THE COURT:  All right.  Are you supposed to be

13  covering this argument, or is Mr. Tulumello supposed to be

14  covering this argument?

15          MR. HYMAN:  No, this is the argument that I'm -- and

16  thank you for raising that.

17              MasterCard -- with regard to section 12, first of

18  all, it's not in the complaint.  This is something that the

19  plaintiff came up with after we filed our papers.  We pointed

20  it out to the Court.  It has been interpreted to provide for

21  personal jurisdiction based on the provision that provides for

22  nationwide service of process.  That's how the courts have

23  interpreted it.

24              Our position is that under the *Daimler* decision by

25  the Supreme Court last year, that application of section 12 for

1  personal jurisdiction purposes is highly questionable.  It's

2  never been specifically addressed by the court.  Some courts

3  still assume that this nationwide personal jurisdiction -- it

4  doesn't matter whether there is or there isn't.  Under

5  section 12 you still have to establish the venue provision,

6  which the courts focus on, and they look at it as a matter of

7  due process as well.

8         THE COURT:  The D.C. Circuit says you've got to look

9  at the venue provision first before you get to the second part

10 about nationwide service.

11        MR. HYMAN:  Well, yes.  I mean, if -- well, if you're

12 invoking nationwide service and trying to use that as a basis

13 for a nationwide personal jurisdiction, you still have to

14 satisfy the venue requirement, which means you have to show

15 that the defendant is either found in Virginia or transacts

16 business in Virginia.

17        And the courts have said in that regard, when you

18 look at issues of transacting business and being found,

19 MasterCard, Inc. clearly is not found in Virginia.  And when it

20 comes to the issue of transacting business, the courts look at

21 various factors, including the systematic and continuous

22 relationship with the State of Virginia, whether these contacts

23 are substantial, whether they are more than *de minimis,* whether

24 they involve an ongoing business activity in Virginia.

25        We have none of that here.  We have no allegations

1    to that effect here.  All we have here is a statement that

2    MasterCard did something outside of Virginia that may have

3    affected Virginia citizens who wanted to make donations to

4    Wikileaks using a MasterCard, but of course that's irrelevant;

5    it has nothing to do with venue.

6              And then, of course, the only other citation from

7    the other side is that MasterCard was somehow involved in this

8    Department of Taxation refund program, which, as we've

9    indicated to you, both in our briefs and by affidavit, is

10   simply not correct.  And that's stands unrebutted at this

11   point, Your Honor.

12             THE COURT:  All right.

13             I've asked you questions that I have.

14             MR. HYMAN:  Okay.

15             I think your questions cover the defensible issue

16   here because our position, of course, is if you apply

17   traditional personal jurisdiction concepts, such as general

18   jurisdiction and specific jurisdiction, you don't have that

19   here because MasterCard is not at home here, so it can't be

20   subject to general jurisdiction.  And the claims that are being

21   asserted in the complaint do not arise from any contacts of

22   MasterCard with the Commonwealth of Virginia.  They have

23   nothing to do with it.  There's no allegation that MasterCard

24   did anything in Virginia, so there would be no basis for a

25   specific jurisdiction.

1            And if you apply *Daimler* -- and I would point out

2   that *Daimler* does not carve any out any exceptions for

3   antitrust cases -- you clearly would have no personal

4   jurisdiction, and that should be the rule even under section 12

5   in light of *Daimler*.

6            But putting that aside, you still have to meet the

7   venue requirements of being found or transacting business.

8   They clearly don't.  They've made no showing to that effect,

9   nor I submit, Your Honor, could they make any such showing on

10   this record.

11            THE COURT:  Thank you.

12            MR. HYMAN:  Thank you, Your Honor.

13            THE COURT:  Let's do jurisdiction first.

14            MR. BINNALL:  Very well, Your Honor.

15            Your Honor, section 12 of the Clayton Act does lay

16   out the jurisdiction that DataCell is relying on in this case

17   in order --

18            THE COURT:  So then you're not trying to use the

19   long-arm statute, and you -- you don't have any argument about

20   personal jurisdiction under the long-arm statute.  Is that

21   right?

22            MR. BINNALL:  Your Honor, I think there is an argument

23   as to Visa as to general jurisdiction, but primarily we are

24   relying on section 12 of the long-arm statute.

25            THE COURT:  Well, tell me why you think there's a

1  general jurisdiction for Visa.

2         MR. BINNALL:  Your Honor, Visa has more contacts than

3  I would say were in the place in the *Daimler* decision or in the

4  *Goodyear* decision with the Commonwealth of Virginia.

5  Specifically, as we cite in our papers, Visa has an office

6  building, a pretty substantial office building in Virginia that

7  is --

8         THE COURT:  Is that the one with the moat you talk

9  about in your papers, the one with the moat?

10        MR. BINNALL:  Yes, Your Honor.  It's the building with

11 the moat.  And employs a substantial number of people in the

12 Commonwealth of Virginia in addition to -- and I admit that

13 this alone wouldn't be enough -- but being registered to do

14 business in Virginia.

15        THE COURT:  What does that have to do with the

16 allegations in the complaint?

17        MR. BINNALL:  And, Your Honor, those are not alleged,

18 and if those are important for the Court, we would ask leave to

19 actually allege those in an amended pleading.

20            However, Your Honor, I think that we can look at

21 section 12 of the Clayton Act -- and that is the one that is

22 the more clear example of why jurisdiction is proper in this

23 court, is that Congress decided over a hundred years ago, in

24 1914, that there should be a national contacts test for

25 antitrust cases, and the contacts that you're looking for are

1    not states, with states specifically, but it's with the United

2    States of America in general.

3           I am not saying that, because of that, you still

4    don't have to look at due process.  But the test for this has

5    been laid out by the Supreme Court for well over 50 years in

6    the *Scophony* decision, Your Honor, where you have some

7    similarities.  You have a business that comes over from England

8    to the United States and sets up a United States company, and

9    then that United States company enters into agreements with

10   other United States companies, and the U.S. Government brings a

11   Sherman antitrust action against those entities.

12          The trial court in that case dismissed the action

13   as to the British company, saying that it wasn't found or

14   transacting business in -- in, I believe in that case it was

15   New York.  And the United States Supreme Court reversed that

16   decision and said that when it comes to the found or

17   transacting business aspects of the -- well, first of all, the

18   Court said that a national contacts test does not offend

19   traditional notions of fair play and substantial justice.

20   This, of course, is a decision that I believe comes after

21   *International Shoe*, so we're still within the modern rubric for

22   personal jurisdiction.

23          And it goes on to then analyze the venue aspect of

24   section 12, which is the venue provision that we are relying on

25   in this case.

14

1          THE COURT:  Well, let's start with MasterCard.  Is

2     MasterCard found in Virginia?

3          MR. BINNALL:  It is found and transacting business in

4     Virginia, Your Honor, yes, it is.  I would venture that most

5     people in this courtroom, if we pulled out our wallets, we

6     would have a MasterCard or Visa card, oftentimes both, in our

7     wallets.  And if we went to any number of retailers within a

8     block of where we're standing right now, we would be able to

9     use that.

10          Now, I understand --

11          THE COURT:  Well, I have a declaration that says

12     something quite the contrary, that talks about it being a

13     holding company.  Do you have some evidence to the contrary?

14          MR. BINNALL:  Well, Your Honor, the holding company is

15     what we have alleged did the bad acts in this case, and its

16     subsidiary is what actually runs the payment processing rubric

17     or scheme that they use for processing --

18          THE COURT:  Let's make sure we're on the same page.

19     My impression was that the declaration suggested that

20     MasterCard is a holding company --

21          MR. BINNALL:  Yes, Your Honor.

22          THE COURT:  -- that has a license arrangement with

23     banks and other financial institutions to use the brand

24     MasterCard.

25          MR. BINNALL:  Yes, Your Honor.

1              THE COURT:  Do you have any evidence to the contrary?

2              MR. BINNALL:  Your Honor, I believe, if allowed to

3    amend our complaint to go more into the aspects of personal

4    jurisdiction, we would be able to -- to show that what

5    MasterCard, Incorporated essentially is doing, either directly

6    or through its subsidiaries, is actually transacting business

7    in the Commonwealth of Virginia by allowing its brand to be

8    used in a way that -- in a payment processing system that the

9    credit card companies have set up largely with banks and with

10   processors, downstream providers, is actually -- would be

11   considered being -- transacting business in the Commonwealth of

12   Virginia.

13             THE COURT:  So you just want time to add additional

14   allegations, but you're not saying you have any facts to

15   contradict the declaration that says it's a holding company.

16   You don't have any facts that support that, do you?

17             MR. BINNALL:  Not exactly, Your Honor.  What I have --

18             THE COURT:  All right.

19             MR. BINNALL:  Well, what I have is an argument as to

20   what --

21             THE COURT:  I was listening to your argument.  I was

22   trying to make sure I didn't -- I wasn't missing out on any

23   facts.

24             Now, you sued Visa Europe, Limited --

25             MR. BINNALL:  Yes, Your Honor.

1          THE COURT:  -- which is a foreign corporation.

2          MR. BINNALL:  It is.  And they recently noted their

3    appearance in this case.  I don't believe that Visa Europe at

4    this point has filed any responsive pleadings before the Court.

5    We have also --

6          THE COURT:  Well, they've made their general

7    appearance, so they're waiving personal jurisdiction.  Is that

8    what you're saying?

9          MR. BINNALL:  Your Honor, I'm not saying that.

10          THE COURT:  Okay.

11          MR. BINNALL:  I -- I think that just came through

12    yesterday, and I --

13          THE COURT:  Oh.  Well, I haven't seen it.  I just --

14          MR. BINNALL:  Yes.

15          THE COURT:  -- was asking that question.

16          Well, let me ask you to focus, if you would, on

17    section 12 of the Clayton Act and whether or not you have

18    properly shown venue as it relates to Visa.

19          MR. BINNALL:  Yes, Your Honor.

20          As far as Visa goes, I think in -- and Visa -- and

21    in their reply brief I don't think they really dispute the fact

22    that they really are found in Virginia.  They have the

23    building, the data center in Virginia.  They hire a number of

24    employees in Virginia.  They transact a good deal of business

25    in Virginia.  Again, they have that moat.

1          They are certainly found here, and they're

2    transacting business here for venue purposes under section 12

3    of the Clayton Act.  And -- matter of fact, of course, is --

4    our argument, as I alluded to earlier, that their contacts here

5    are so numerous that it would actually satisfy the *Daimler* and

6    *Goodyear* tests for general jurisdiction.

7          THE COURT:  All right.  Thank you.

8          MR. BINNALL:  Thank you, Your Honor.

9          MR. HYMAN:  Your Honor, two -- two briefs comments.

10         The holding company does not do the licensing with

11   regard to MasterCard.  There was no reference made in either

12   the complaint or the opposition papers to any operating

13   subsidiary.  The operating subsidiary is not before the Court.

14         However, in the declaration that was submitted to

15   you, it is stated that when the operating subsidiary,

16   MasterCard International, Incorporated, licenses banks to issue

17   the credit or debit cards that consumers in Virginia use, that

18   licensing agreement is entered into in New York where

19   MasterCard International, Incorporated is also located, as is

20   Visa, Inc.  So therefore, the suggestion that there is some

21   basis for venue here in Virginia against either MasterCard or

22   MasterCard International is purely -- purely speculative.

23         As far as the reference to the amendment of the

24   complaint, I would point out that the plaintiff, DataCell,

25   brought a complaint against these companies in Europe.  It was

18

1  rejected.  They filed a complaint in this action.  We moved to

2  dismiss it.  They submitted an opposition set of papers which

3  essentially tried to rewrite the complaint.  We now know what

4  they were going to say in those papers, and explained why that

5  was not going to fly.  And now we're hearing yet another story

6  in addition to the venue and the jurisdiction -- and

7  Mr. Tulumello will speak to this -- their claims on the merits,

8  the substance of their complaints, are meritless.

9          And with regard to the --

10         THE COURT:  Well, I can't consider merit on a 12(b)(6)

11  motion -- or a 12(b)(1) motion, can I?

12         MR. HYMAN:  They're legally deficient.

13         THE COURT:  All right.

14         MR. HYMAN:  Let me rephrase that.  They're legally

15  deficient, as Mr. Tulumello will explain.

16         And with regard to Visa, I would have to defer to

17  Mr. Tulumello on the jurisdictional and venue issues because I

18  don't speak for Visa.

19         THE COURT:  All right.  Thank you very much.

20         MR. HYMAN:  Thank you.

21         THE COURT:  Mr. Tulumello, I'll hear from you.

22         MR. TULUMELLO:  Good morning, Your Honor.  Drew

23  Tulumello for Visa, Inc.

24         I'd like to address the three main reasons the

25  complaint should be dismissed without leave to amend, even

1  assuming there is personal jurisdiction over Visa, Inc.:  Lack

2  of antitrust standing; the failure to plead a plausible

3  antitrust claim under the Supreme Court's decision in *Twombly;*

4  and the infirmities of the Virginia state law claims.

5          Turning first to antitrust standing, plaintiffs

6  have failed to allege any plausible market or any harm to

7  competition in any plausible market in the complaint.  The

8  plaintiff alleges competition to the marketplace of ideas.

9  That is not a cognizable market under the Sherman Act.  It is

10  impossible to define the outer boundaries of the marketplace of

11  ideas, who the producers are in the marketplace of ideas.  It

12  is essentially infinite, as Your Honor concluded with respect

13  to the Internet in the *AOL* case.

14          In their briefing papers, they try a new market,

15  which is the news media market.  That also is not a cognizable

16  Sherman Act claim.  They rely on the Fourth Circuit decision in

17  *Satellite Television* which involved paid television and its

18  economic substitutes in metropolitan Richmond, whereas the news

19  media market, as they concede in page 17 of their own brief,

20  would include every blog, television program, newspaper,

21  magazine, Twitter account.  In fact, they say that the

22  competition between participants in the news media marketplace

23  is so widespread that any attempts to limit it for purposes of

24  market definition is futile.

25          And we agree with that.  So whether you look at --

1         THE COURT:  Well, their paragraph 7 suggests that

2    they're a corporation that services its customers -- include

3    server hosting and technical support.  Does that sound like

4    news media to you?

5         MR. TULUMELLO:  No, not at all.

6         THE COURT:  Now, they do mention Sunshine Press and

7    having an agreement with Sunshine Press to collect money and to

8    share money.  In paragraph 15 they talk about the conspiracy to

9    punish Sunshine Press and put it out of business as retribution

10   for disclosure of the State Department cables, Wikileaks.  What

11   does that have to do with a market and restraint of trade?

12        MR. TULUMELLO:  Your Honor, it has no -- it has no

13   discernible connection at all to any type of market recognized

14   under antitrust law or to any harm to competition in any market

15   recognized in antitrust law.  And that's why there is no

16   antitrust standing.

17             And as this Court has held, and the Fourth Circuit

18   has held, the failure to plead antitrust standing is alone

19   fatal, and the complaint can be dismissed on that basis.  And I

20   would say in particular, echoing what MasterCard's counsel

21   said, not only did they try to allege a market in the

22   complaint; they tried a whole other set of markets in their

23   opposition brief.  It's clear they don't have an antitrust

24   theory for this case.

25             So we would submit --

1           THE COURT:  Have they alleged antitrust damages by

2   saying that they lost the opportunity to collect 5 percent of

3   whatever donations might have been made at some point in the

4   future by -- it says, I think, Virginia residents?  I'm not

5   sure if that's in the complaint or not.  Maybe I made that up.

6           MR. TULUMELLO:  No, Your Honor --

7           THE COURT:  Would that be an antitrust damage?

8           MR. TULUMELLO:  It would not be.  So they do -- they

9   make the 5 percent allegation in their tortious interference

10  claim, and that brings up the common distinction between

11  antitrust injury and economic injury.  The Fourth Circuit has

12  said repeatedly antitrust injury and simple economic injury are

13  not the same things.  The antitrust laws are not a vehicle for

14  bringing traditional tort claims.

15          So the harm to -- the 5 percent harm, if even --

16  credit that allegation and say, okay, DataCell, you were, you

17  know, harmed because you didn't get the 5 percent of these

18  donations.  That does not flow from any injury to competition

19  in a recognized or cognizable antitrust market.

20          And so even if it is a type of harm, it is not

21  antitrust injury, as the Fourth Circuit has defined it in

22  multiple cases, *Oksanen* -- even as Your Honor described it in

23  the *AOL* opinion.  So I don't think the 5 percent allegation

24  gets them anywhere close to antitrust standing, and again, that

25  alone is fatal on the Sherman Act claims.

1          THE COURT:  Well, would their complaint be sufficient

2    under *Bell Atlantic versus Twombly* with allegations of

3    conspiracy -- paragraph 23 says, The defendants successfully

4    conspired with each other.

5          Are there facts that support some agreement to harm

6    the market here?

7          MR. TULUMELLO:  No, Your Honor.  And so -- standing, I

8    think, ends the analysis.  If we then say, okay, we're going to

9    assume they pleaded standing, which we don't think they have;

10   now let's look at, have they pled a viable section 1 claim?

11   Under *Bell Atlantic versus Twombly*, they must plead facts to

12   show an agreement and an unreasonable restraint of trade, and

13   it must be more than conclusory assertions or formulaic

14   allegations.

15         And if you look at their complaint, there's nothing

16   but the conclusory assertion that the defendants conspired.

17   That's literally all the factual support that is offered.  And

18   it's precisely the type of formulaic approach, conclusory

19   assertion that *Bell Atlantic versus Twombly* says is

20   impermissible to state a claim.

21         Furthermore, once again, they backed off that

22   theory that's in their complaint when they filed their

23   opposition.  The theory of the complaint is that the defendants

24   conspired.  What they tell us in the brief is that something

25   very different happened, is that there were multiple what they

1    call separate, independent and parallel conspiracies.

2            And as to Visa, Inc., we apparently engaged in two

3    conspiracies, according to the opposition brief; we conspired

4    with Senator Lieberman and we conspired with Representative

5    King to damage the marketplace of ideas.  That's one

6    conspiracy.

7            And then the second conspiracy is we got to

8    together with PBS/Teller and Valitor over in Iceland to

9    conspire to damage the news media market.

10           There's not a single allegation in the complaint

11   about either of those conspiracies.  Again, even if -- the

12   allegations -- even if you take the theory in the brief about

13   Visa's interactions with government officials, that would

14   clearly be barred under the Noerr-Pennington doctrine; the

15   antitrust laws regulate business, not politics, not petitioning

16   the government.  It doesn't -- that bars any claims about

17   interactions with government officials.

18           And again, there's no relevant market.  No

19   allegations of harm to competition with respect to the second

20   supposed conspiracy that we engaged in with those Icelandic

21   entities.  And so --

22       THE COURT:  I meant to ask you about causation,

23   because you had a nice little chart in your brief about

24   causation on page 5 about all the links you would have to draw

25   to somehow come back to Visa.  Do you want to address that?

1          MR. TULUMELLO:  Yes, I do, Your Honor.

2          The -- even to prove Article III standing, you must

3   prove immediate causation and redressability.  And on the

4   theory that they pled, under -- whether you take the

5   marketplace of ideas or the news media marketplace -- in the

6   antitrust allegations of their complaint they're alleging

7   injury that is really derivative of Wikileaks.

8          When you are talking about suppression of ideas or

9   the news media market, DataCell, by its own allegations, is not

10  in that market.  So the reason we put in the chart was to show

11  just how attenuated any injury to DataCell is from an alleged

12  conspiracy somehow aimed at Wikileaks.

13         THE COURT:  All right.

14         MR. TULUMELLO:  And finally, Your Honor, with respect

15  to the Virginia law claims, the Virginia antitrust law claims

16  are entirely derivative of the federal law claims.  Virginia

17  law follows -- as a matter of Virginia law, follows the Sherman

18  Act jurisprudence.  And then the two tort claims, tortious

19  interference, civil conspiracy, they both fail for the same

20  reason.  Both require, as a predicate for those torts, that

21  there be an allegation of improper means with respect to

22  tortious interference; and civil conspiracy, that there be an

23  unlawful objective.

24         THE COURT:  Would restraint of trade be a unlawful,

25  improper means?

1          MR. TULUMELLO:  If it were unlawful -- if it -- if you

2    found there were an adequate allegation that there was a

3    relevant antitrust market and that there was harm to

4    competition in that market, then yes, I think an antitrust

5    violation would be a predicate act for a tortious interference

6    claim or for a Virginia civil conspiracy claim.

7          But if you include, as we think you should, that

8    there isn't a viable Sherman Act claim, then the Virginia state

9    law claims fall for the same reasons.

10          And then that would turn us to, finally, whether

11    their request for leave to amend at the end of a complaint

12    should be granted.  And this Court followed an approach in *AOL*

13    that we believe should be followed here.

14          They filed the case at the end -- last day of the

15    four-year statute of limitations.  They have trotted out the

16    number of different theories as to what is the market, what are

17    the conspiracies.  They have had ample time to think about it,

18    and they've tried numerous approaches.

19          There's no visible route to a plausible antitrust

20    claim or harm to competition here.  There's just no antitrust

21    theory of the case.  And particularly with respect to antitrust

22    standing, there is a clear rule that if the dismissal is for

23    lack of antitrust standing, leave to amend would be futile.

24          And so because the state law claims are simply

25    derivative of the federal law claims, we think the proper

26

1  disposition of the case would be dismissal without leave to

2  amend.

3          THE COURT:  Thank you.

4          MR. TULUMELLO:  Thank you.

5          THE COURT:  I know you didn't want to talk about

6  personal jurisdiction with Visa.  You didn't want to talk about

7  that?

8          MR. TULUMELLO:  I'm certainly happy to address it, but

9  I think the -- sort of the answer on the pleading deficiencies

10  is sufficiently clear.

11         THE COURT:  All right.  Thank you.

12         MR. TULUMELLO:  Yeah, thank you.

13         MR. BINNALL:  Your Honor, this is admittedly an

14  unusual factual scenario for an antitrust case.  DataCell is

15  not suing its competitors for conspiracy against DataCell.

16  Instead, it's suing Visa and MasterCard, companies from

17  different industries completely who decided to play the roles

18  of supreme arbiter in the marketplace of the news media.  And

19  the news media marketplace, Your Honor, was specifically pled

20  in the complaint.  It was pled, Your Honor, in paragraph --

21  paragraph 29, Your Honor.

22         THE COURT:  It says, "injured the media market by

23  suppressing the marketplace of ideas."

24         MR. BINNALL:  Exactly.  And it's --

25         THE COURT:  Where can I buy an idea?

1          MR. BINNALL:  I'm sorry.  What's that?

2          THE COURT:  Where can I buy an idea?

3          MR. BINNALL:  Your Honor, you can buy an idea from any

4    number of different media outlets all through the world.  And

5    the more appropriate thing is where can you sell an idea,

6    because that's what people in the media market are trying --

7    are doing.  They're selling stories and they're selling ideas.

8    And --

9          THE COURT:  I had the impression from paragraph 7 that

10   you were a -- it services its customers, including server

11   hosting and technical support.

12         MR. BINNALL:  Yes, Your Honor.

13         THE COURT:  Where do you say that DataCell is a media

14   outlet?

15         MR. BINNALL:  Your Honor, if you look at the

16   attachments to the complaint, there's the agreement we attached

17   with PBS/Teller that shows the partnership between DataCell and

18   Sunshine Press.  And what you have to understand about --

19         THE COURT:  That was a project to share money, wasn't

20   it?

21         MR. BINNALL:  Well, it was, Your Honor, but it was a

22   project to share money because they entered into this

23   partnership together to put together the Wikileaks project.

24              And Wikileaks is not, in itself, a company.  It's a

25   website.  And it's a website that is run by essentially two

1  different organizations here.  You have the content -- and

2  admittedly a bulk of the work is coming from Sunshine Press

3  Productions, and --

4          THE COURT:  That's not my problem.  I'm just trying to

5  make sure I understand what is DataCell.  So --

6          MR. BINNALL:  Yes.

7          THE COURT:  -- you are saying that DataCell is a part

8  of the media --

9          MR. BINNALL:  Well --

10          THE COURT:  Let me finish.

11          MR. BINNALL:  Oh, I'm sorry, Your Honor.

12          THE COURT:  You just told me that Wikileaks is not

13  really a media; it's a website where information can be found.

14  But Wikileaks or Sunshine Media is not before me.  What's

15  before me is DataCell.  Correct?

16          MR. BINNALL:  Yes.  Yes, Your Honor, that's correct.

17  DataCell is before you, not Sunshine Press, although our

18  position is Sunshine Press and DataCell together put together

19  Wikileaks.

20          THE COURT:  And in paragraph 15 you say it's to punish

21  Sunshine Press and try to put it out of business as retribution

22  for disclosure of State Department cables.  You don't say it

23  tried to put DataCell out of business, do you?

24          MR. BINNALL:  Yes, Your Honor, and admittedly, Your

25  Honor, that could be more artfully pleaded, which is why, if

1    that point is important to the Court, we would ask leave to

2    replead that, because really it is that they're trying to harm

3    Wikileaks.  And the harm to Wikileaks then hurts both Sunshine

4    Press and DataCell.  What DataCell --

5              THE COURT:  Focus on the antitrust standing, if you

6    would.  That might help me --

7              MR. BINNALL:  Yes, Your Honor.

8              THE COURT:  -- focus you and focus me.  I apologize

9    for going on an excursion to the left or right.

10             MR. BINNALL:  No, Your Honor, it's, of course, more

11   important what's important to the Court.

12             And as far as antitrust standing goes, Your Honor,

13   first we look at the relevant market.  And the relevant market

14   in this case is, as we've defined, the media market.  And the

15   court in the *Satellite Television* case -- the Fourth Circuit,

16   Your Honor, goes and talks a good amount about the fact that

17   markets can be broad.  And this is a broad market, because what

18   you look at is a marketplace is where commodities are

19   reasonably exchangeable by consumers for the same purpose make

20   up part of the trade or commerce.

21             And in this, when you -- what you're selling is

22   information and ideas.  It is -- the media is, admittedly,

23   broad.  It's now worldwide.  If I want to get my news, I can

24   turn on CNN and I can turn on the BBC.  Likewise, if I want to

25   read something, I can go to the WashingtonPost.com, I can go to

1    the Guardian, I can look at any number of different blogs,

2    whether it's local in Alexandria or national or international.

3    And one of the places I can go for information is Wikileaks.

4         And it is part of the -- this international

5    exchange of information and ideas that's part of the media

6    marketplace.  And the *Satellite Television* case specifically

7    said you don't want to do a submarket analysis.  What you want

8    to do is see what is exchangeable for all of the part of trade

9    or commerce.

10         And when you have two payment processing giants,

11   such as Visa and MasterCard, that step in and say, we're

12   putting a stop to any donations going to a certain competitor

13   in the marketplace, that has an effect on the entire market.

14        THE COURT:  Well, I was going to ask you to return to

15   the issue of antitrust damages.  What damages do you have?  It

16   seems that you're focused in on not being able to collect your

17   5 percent of the donations to Wikileaks.  How does that harm

18   the whole market, Mr. Binnall?

19        MR. BINNALL:  Well, it harms the entire market because

20   it essentially put Wikileaks pretty close to out of business.

21   And it harms the entire market because it lets media -- it puts

22   media organizations on notice that if they do something that

23   upsets members of the United States Government, the United

24   States Government can then step in and talk to people that it

25   regulates, such a Visa and MasterCard, and put a stop to that

1   media organization, where it couldn't do so legally.  The

2   United States Government can't go into this court and ask for

3   an injunction against Wikileaks publishing information.  That

4   much is pretty settled as far as the case law goes.  They can't

5   go and they can't pass a law that says, Wikileaks can no longer

6   publish its information.

7          So what has happened here -- and this is very

8   different than Noerr-Pennington because it's going the opposite

9   direction.  This isn't private companies petitioning the

10  Government for redress of grievances.  This is the Government

11  petitioning private companies for redress of the Government's

12  grievances.  And there's no constitutional right or other

13  policy that protects the Government to do that.  The Government

14  has its own means to do things, and it shouldn't be able to

15  find a way around that.

16         How this all ties back into the antitrust damage --

17  and I understand that this is different from most other

18  antitrust cases, but it still fits within the antitrust

19  rubric -- is that it makes it so that everyone in the media

20  market is on notice that if they upset the United States

21  Government, they may pay the price of not being able to collect

22  any money anymore from companies like Visa and MasterCard and

23  essentially having to go out of business.  And that's a huge

24  chilling effect.

25         If, for instance --

1          THE COURT:  I understand that position.  I think
2    you've made your point.  And I have read your brief too.
3          Okay.  So then the Virginia claims really rise and
4    fall with the federal antitrust claims.  Is that right?
5    Meaning that the Virginia antitrust law is pretty much the same
6    as the Sherman Act and --
7          MR. BINNALL:  Yes, Your Honor.
8          THE COURT:  -- and what we're left with, then, for
9    tortious interference with business expectancies -- unlawful
10   restraint of trade would qualify as improper means, wouldn't
11   it?
12         MR. BINNALL:  It would, Your Honor.
13         THE COURT:  All right.
14         MR. BINNALL:  And also, for tortious interference, the
15   courts have said you can look at things like ethical conduct to
16   see if there's an improper means.
17         And then -- you know, we propose that, yes, that is
18   what has gone on here is wrongful and unethical conduct.
19   They're trying to shut down a media organization because they
20   disagree with it.  And that sets the -- where we need to go as
21   far as tortious interference, and likewise, once you get to
22   that tortious interference, then you have the wrongful act for
23   purposes of conspiracy as well.
24         THE COURT:  All right.  So yours is a *Bell Atlantic*
25   *versus Twombly* --

1          MR. BINNALL:  Yes, Your Honor.

2          THE COURT:  -- 12(b)(6) analysis of the complaint.

3     Looking at the four corners of it, where are your facts

4     supporting a conspiracy between Visa and MasterCard,

5     Incorporated?  Where are the facts?

6          MR. BINNALL:  Yes, Your Honor.  If you want to look at

7     paragraph -- they really start, Your Honor, on paragraph 12,

8     and they go on from there -- where you have the Government

9     officials, the members of Congress -- and they're the ones who

10    coordinate the conspiracy.  And they coordinate the conspiracy

11    directly with Visa.  They coordinate the conspiracy directly

12    with MasterCard.

13         THE COURT:  So you're saying that by a congressman

14    calling a credit card company and complaining, that the

15    congressman and the credit card company have entered into a

16    conspiracy to run Wikileaks out of business?

17         MR. BINNALL:  Yes, Your Honor.  That is our position

18    as to the horizontal conspiracy.  It is essentially a spoke and

19    hub-type conspiracy, Your Honor, where you have members of

20    Congress at -- at the center, and they are directly conspiring

21    with the credit card companies.

22              And, indeed, the credit card companies take the

23    action that those individuals at the -- and I would say that,

24    in this part, that the members of Congress are acting in their

25    individual capacities, and then -- so that they are asking Visa

1   and MasterCard to do this.  Visa and MasterCard do indeed take

2   efforts successfully to put a stop to the payment processing

3   for Wikileaks.

4           THE COURT:  Where do you allege that Visa and

5   MasterCard had a conversation to harm Wikileaks?

6           MR. BINNALL:  With each other?

7           THE COURT:  Yes.

8           MR. BINNALL:  We do not, Your Honor.

9           THE COURT:  Okay.

10          MR. BINNALL:  And -- but again, so you have conspiracy

11  number one, that horizontal conspiracy that is with each of the

12  credit card companies and the members of Congress.  And then

13  you have conspiracy number two which we allege, which is then

14  each of them call PBS/Teller and Korta.  And that is someone

15  who is downstream from them in the -- in their payment

16  processing scheme.

17          And that is more of a horizontal conspiracy than a

18  vertical conspiracy, but it is a conspiracy under antitrust

19  law, nonetheless.

20          And we do allege that they did that.  And that is

21  more than just alleging parallel conduct.  It's alleging that

22  they both did the same thing on the same day, and that the

23  specific actions that we allege that they did, contacting

24  PBS/Teller and then, later, contacting Valitor in Iceland when

25  Wikileaks tried to move its payment processor to another

1    company, that in itself is a combination -- contract or

2    conspiracy under section 1 of the Sherman Act.  And that has

3    been properly pled.

4              THE COURT:  Well, I've asked you all the questions I

5    have.  And I have read your brief.

6              MR. BINNALL:  Thank you, Your Honor.  And we

7    appreciate the Court's time on that.  And I believe that I've

8    covered most of the areas that I wanted to discuss with the

9    Court as well.

10             Thank you.

11             THE COURT:  Thank you.

12             MR. TULUMELLO:  Your Honor, I think DataCell's

13   presentation confirms that there is no antitrust standing.

14   They've explained that their market is news or information on a

15   worldwide basis, from Alexandria to the Guardian to worldwide.

16   That's not a cognizable antitrust market.  That ends the

17   analysis under antitrust standing.

18             Even if you got over that hump with respect to

19   *Twombly*, they've now conceded that they're not alleging that

20   there was a conspiracy or an actual agreement between Visa,

21   Inc., and MasterCard; instead, it's some other conspiracies

22   with Government officials and some folks over in Iceland.  So

23   they've not even alleged an agreement, which is the first

24   showing required under *Twombly* before you even get to an

25   unreasonable restraint of trade.

1          And then, furthermore, under the *Twombly* analysis,

2     in terms of evaluating the plausibility of a Sherman Act claim,

3     they need to plead allegations that the actors had an economic

4     incentive to engage in joint conduct, because the goal of the

5     exercise was not something that they could achieve through

6     unilateral conduct.  That's the *Vermiculite* case.  And it's

7     clear that if the theory here is we were trying to ingratiate

8     ourselves with Senator Lieberman and Representative King, that

9     Visa could have terminated Wikileaks on its own; it didn't need

10    MasterCard or anybody else to -- in order to do the

11    ingratiating.

12          So I think no matter how you -- you look at it --

13    and I think antitrust standing is -- is the sort of bright line

14    easiest approach, but I think no matter how you look at it, the

15    complaint should be dismissed, and for the reasons I mentioned

16    previously, it should be dismissed without leave to amend.

17          THE COURT:  All right.

18          Counsel, the matter has been briefed and

19    sufficiently discussed in oral argument.  I'll issue a written

20    ruling.  I'll take the matter under advisement.

21          Thank you very much.  You're excused.

22          MR. BINNALL:  Thank you, Your Honor.

23          (PROCEEDINGS CONCLUDED AT 11:23 A.M.)

24                        -o0o-

25

37

1  UNITED STATES DISTRICT COURT    )

2  EASTERN DISTRICT OF VIRGINIA    )

3

4            I, JULIE A. GOODWIN, Official Court Reporter for

5  the United States District Court, Eastern District of Virginia,

6  do hereby certify that the foregoing is a correct transcript

7  from the record of proceedings in the above matter, to the best

8  of my ability.

9            I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action in

11  which this proceeding was taken, and further that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14            Certified to by me this 17TH day of AUGUST, 2015.

15

16

17

18                      __/s/_____
                        JULIE A. GOODWIN, RPR
19                      CSR #5221
                        Official U.S. Court Reporter
20                      401 Courthouse Square
                        Tenth Floor
21                      Alexandria, Virginia  22314

22

23

24

25

Julie A. Goodwin, CSR, RPR